The People of the State of Illinois, Plaintiff-Appellee, *v.* John L. Robinson *et al.,* Defendants-Appellants.

(Nos. 52744, 52745, 52746, 52747, 54887, cons.;

First District—February 9, 1972.

Gerald W. Getty, Public Defender, (Theodore A. Gottfried and James J. Doherty, Assistant Public Defenders, of counsel,) and William R. Carney, all of Chicago, for appellants.

Edward V. Hanrahan, State's Attorney, of Chicago, (Robert A. Novelle and James S. Veldman, Assistant State's Attorneys, of counsel,) for the People.

Mr. JUSTICE BURMAN delivered the opinion of the court:

The defendants, John L. Robinson, Floyd Cummings, Thomas Lee Baggett, and Ernest Sawyer, were jointly indicted and tried before a jury for the offense of murder. The jury returned a verdict of guilty as to all four defendants, and each was sentenced to serve 50-75 years in the penitentiary.

On appeal, the defendants contend that the testimony of the State's only occurrence witness was so unsatisfactory, implausible, and unbelievable that it was insufficient to prove them guilty beyond a reasonable doubt.

Early in the morning of January 21, 1967, Officer Vincent Strangis of the Chicago Police Department and his partner went to the Pretty Penny Food Market, owned and operated by Sam Gerrick, and located near the intersection of 63rd Street and Stewart Avenue in the City of Chicago. A few minutes after their arrival at about 3:00 A.M. they were joined by James LaNier, the store manager, who had been called by

Gerrick's wife after her husband failed to return home at the normal hour. Gerrick's automobile was parked near the building, the iron gate in front of the store was partially open, and the door to the main entrance was unlocked. Everything appeared to be in order in the front part of the store; however, when Officer Strangis went into the office in back of the store, he found the bottom part of the safe open and empty, tonic bottles spilled on the floor, and the trap door which leads to the cellar open. Officer Strangis then went through the trap door into the basement where he found the severely beaten body of Sam Gerrick resting in a pool of blood. Beer and tonic cases stored in the basement were overturned; and a wallet, its contents, and a man's hat were strewn about the body.

James LaNier, who had been employed by Gerrick for eight years, testified that the store's hours on January 20, 1967, were from 7:30 A.M. to 10:00 P.M. He left the premises on that day at about 7:30 P.M.; but before leaving, he went to the office and borrowed $28 from his employer. While he was there, he noticed that Gerrick had a Hundred and a Fifty Dollar bill in his wallet and that a deposit card designating an amount in excess of $2,000 had been prepared. This money was never deposited.

He and the decedent worked in the store on alternate evenings, and he outlined the procedure which was followed upon closing the store at 10:00 P.M. First the two registers would be totalled and the funds in the cash drawers would be removed, wrapped with a band, and placed in canvas bags in the safe. Then a bank of $40 and $30 would be counted out to put in the two registers on the next morning. Thereafter, the alarm system, the basement door, and the cooling system would be checked. After all of this was done, Mr. Gerrick would put on his hat and coat, turn on the alarm with his key, lock the front door, and close the iron gate in front of the store. This procedure usually was completed by 11:30. Two rows of lights were left on all night so that the store was completely illuminated in the evening.

When James LaNier returned to the store at 3:00 A.M. on the next day, the police found the body of his employer and he noticed that the cash, checks, and food stamps were missing from the safe, that the trap door to the basement was open, that a sale had been rung up on the register in the liquor department, and that the decedent's key was inserted into the alarm system. The trap door in the office was normally covered by empty cases of pop, and when it is so covered, it is hidden from view. LaNier knew the defendant, Floyd Cummings, who had worked for Gerrick for about two months, and he recognized the faces of the defendants, John Robinson and Ernest Sawyer.

Carrie Lee Hyde, who lived around the corner from the market and

who was a customer of the decedent, testified that at 10:30 P.M. on January 20, 1967, she went to the decedent's store to borrow a dollar. When she arrived, Gerrick was preparing to leave, and just after he gave her the money, four men, whom she identified as the defendants, knocked her aside and pushed the decedent back into the store. She then heard someone order wine or whiskey and saw John Robinson ring up the register at the liquor department. Floyd Cummings shouted a profanity at the decedent and said "* * * you got a warrant out for me." Thomas Lee Sawyer shouted the same obscenity and said "* * * you don't want me in your place at all." Sawyer struck Gerrick with his fist, Baggett sprayed a substance into his face, and Robinson put a knife around his neck. Cummings then put a gun to Gerrick's head; and although Carrie Hyde heard no sound, she saw the decedent slump back with his eyes closed. Cummings then handed the gun to Baggett and went to the back of the store where he picked up something which she later learned was money, checks, and food stamps. The other defendants meanwhile dragged Gerrick to the rear.

At this point, when Carrie Hyde saw that no one was looking at her, she started to run to her home. Cummings, however, overtook her, cursed her, and went to her apartment with her. After 15 to 20 minutes, Cummings opened the back door of the apartment for the others who entered, tore up checks, burned the food stamps, and placed the money in bags which they obtained from her. Cummings then opened the front door and gave the money to two men whose faces were hidden by masks. The men threatened her and told her that if she said nothing, they would give her some money later. After that they all left.

Prior to the date of the killing, she had seen the four defendants in the neighborhood, and she knew Cummings, Baggett, and Sawyer by nickname. All the defendants had been frequent visitors in her home except John Robinson, who had been there only twice.

On cross-examination she testified that she reported what she had seen to a Sergeant Harvey and gave him a description of the killers and that she had identified the defendants from photographs. She further testified that after she was released from jail she spoke with an Officer Norman about the incident. She explained that she had been jailed because of a misunderstanding arising out of a landlord-tenant problem. With regard to the shooting she stated that she saw Cummings put a gun to the decedent's head and that even though she heard no gunshot, she knew Gerrick had been shot because she saw blood.

Martin Carney, Chief Clerk of the Criminal Department of the Municipal Branch of the Circuit Court, testified that his records indicated that on December 7, 1966, a bench warrant was issued upon the com-

plaint of Sam Gerrick for the arrest of Floyd Cummings on a charge of theft.

Each of the defendants except Cummings interposed an alibi defense. Clarence Ervin, a friend of defendant, Thomas E. Baggett, and Mack Baggett, the defendant's brother, testified that they were with Thomas Baggett at a club named, My Fair Lady, from 9:00 P.M. on January 20, 1967, to 2:00 the following morning. Ernest Sawyer, testified on his own behalf, and stated that he was at the Mustang Lounge from 4:00 P.M. on January 20, 1967, to 12:20 A.M. the next day. He denied that he was at the food store at any time on the night of the crime. John Robinson testified on his own behalf and stated that on the night in question he went to various locations with Charles Williams until 11:00 P.M., and that thereafter, he went to the Club Superior where he stayed until 2:00 A.M. This testimony was corroborated by Charles Williams, a bus driver for the Willett Motor Coach Company.

The defendants contend that they were not proven guilty beyond a reasonable doubt, and they argue that Carrie Hyde's uncorroborated testimony was so riddled with inconsistencies, contradictions, and variances, that it was implausible and unbelievable. Much is made (1) of the difficulty which Carrie Hyde would have had in hearing and observing from her vantage point outside of the store (2) of the inconsistency of her testimony concerning the shooting on the first floor with the evidence of a struggle in the basement, and (3) of the improbability of the events which occurred after she left the front of the store.

■■■ It is well settled that the positive testimony of a single credible witness is sufficient to sustain a conviction even though such testimony is contradicted by the accused (*People v. Hampton,* 44 Ill.2d 41, 253 N.E.2d 385), and that a court of review will not overturn the verdict of a jury unless it is palpably contrary to the weight of the evidence or so unsatisfactory as to raise a reasonable doubt of guilt. *People v. Hairston,* 46 Ill.2d 348, 263 N.E. 840.

We have carefully examined the record. As a whole it does not contain such inconsistencies or contradictions as to make the testimony unbelievable or to leave a reasonable doubt of the defendants' guilt. Carrie Hyde gave a clear account of the incident which was unshaken after vigorous cross-examination by defense attorneys. She knew the defendants before the date of the killing, and she had ample opportunity to view them both in the store and in her apartment. Her testimony was corroborated by other evidence in the record. She stated on direct examination that the four defendants burst into the store just as Gerrick was preparing to leave. The facts (1) that the register had been cleared, (2) that the decedent's key was inserted in the alarm system which is

set one minute before the last person leaves the premises, and (3) that the decedent's hat was found next to the body all indicate that Gerrick was about to depart when he was accosted by his killers. She testified that John Robinson rang up the register in the liquor department, and James LaNier confirmed that a purchase was recorded on that register. She said that she overheard Cummings shout at Gerrick for having a warrant issued and a court clerk verified the fact that a warrant had been issued against Cummings upon the decedent's complaint. She testified that she saw rubber bands around One Hundred Dollar bills and LaNier stated that Gerrick had a Hundred Dollar bill in his wallet and that rubber bands were normally placed around the money taken from the registers. Moreover, the trap door through which the killers entered the basement was normally covered with cases of tonic bottles, and its existence would be known only to persons such as Floyd Cummings who was familiar with the establishment.

██ We have summarized the testimony of Miss Hyde in the preceding statement of facts and deem it unnecessary to again discuss it in more detail. The jury saw and heard the witnesses, and it was presented with the same argument as is made here. It, nevertheless, concluded that Miss Hyde's testimony was credible and that the alibi testimony offered by certain of the defendants was unworthy of belief. It is the function of the jury to weigh the testimony, to judge the credibility of witnesses, and to determine factual matters in debatable sets of circumstances. (*People v. Nicholls*, 42 Ill.2d 91, 245 N.E.2d 771.) From a review of the entire record, it is clear that the jury's verdict was justified.

██ It is also contended that Carrie Hyde should be considered as an accomplice because she was originally charged with accountability for the death of Sam Gerrick and that as a result her testimony should be viewed with circumspection. There is, however, no indication in the record that she voluntarily participated in the perpetration of the crime. To the contrary, the evidence shows that she was threatened and intimidated by the defendants after the commission of the offense. The assumption that Carrie Hyde was an accomplice is unwarranted on the record before us. The cases cited by the defendants in which the witness, while testifying, openly admitted complicity in the commission of the crime are inapplicable to the facts of the present case.

John Robinson, subsequent to his conviction, filed a petition under Section 72 of the Civil Practice Act (Ill. Rev. Stat. 1967, ch. 110, par. 72) which was denied without a hearing. During the pendency of this appeal, an evidentiary hearing was conducted by the trial court on that issue and accordingly the argument raised in the brief that it was error

to deny the petition without a hearing is no longer before us and was not argued.

For the reasons stated the judgment of the Circuit Court is affirmed.

Judgment affirmed.

DIERINGER, P. J., and ADESKO, J., concur.