2019 IL App (1st) 180182-U

THIRD DIVISION
December 31, 2019

No. 1-18-0182

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 15 CR 15299 |
| | ) | |
| SPIRO LEMPESIS, | ) | Honorable |
| | ) | Gregory R. Ginex, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE HOWSE delivered the judgment of the court.
Presiding Justice Ellis and Justice Cobbs concurred in the judgment.

ORDER

¶ 1    *Held*:   The judgment of the circuit court of Cook County is reversed; the trial court's limitation on defendant's subpoena *duces tecum* prejudiced defendant because defendant's subpoena sought relevant and material information that could have aided in his defense and the trial court failed to conduct an *in camera* examination of all of the material potentially responsive to the subpoena to determine if it was discoverable or subject to the work product privilege.

¶ 2    Defendant appeals his conviction following a bench trial on one count of criminal sexual assault and two counts of aggravated criminal sexual abuse against a minor at a time when defendant was the victim's baseball pitching coach.  On appeal defendant argues the circuit court of Cook County committed reversible error in pretrial rulings on discovery, violated his Confrontation Clause rights by improperly limiting cross-examination, and erroneously relied on evidence outside the record and improperly admitted evidence.  Defendant also argues the State failed to prove him guilty beyond a reasonable doubt because the victim's testimony was inconsistent and contradicted.

¶ 3    For the following reasons, we reverse defendant's conviction and remand for a new trial.

¶ 4                                    BACKGROUND

¶ 5    The State charged defendant, Spiro Lempesis, with one count of criminal sexual assault and three counts of aggravated criminal sexual abuse against A.C. when A.C. was between the ages of 13 and 17 years old and defendant was 17 years old or older and "held a position of trust, authority, or supervision in relation to A.C., to wit: coach."

¶ 6    In 2012 Concordia University, a codefendant in a civil lawsuit A.C. filed against defendant, retained an attorney to conduct an internal investigation regarding defendant. Concordia hired attorney Patrick Collins of Perkins Coie to investigate if defendant had committed any misconduct other than with A.C. Approximately forty witnesses were interviewed during the investigation.

¶ 7    Before trial in this case, defendant subpoenaed from Concordia "[a]ny and all documents, statements, reports, *** [or] investigation *** pertaining to any information of alleged inappropriate touching and/or communication that [defendant] allegedly had with any individuals at any time. This includes any investigation by any individual concerning alleged misconduct committed by [defendant.]" The subpoena also sought any writings, documents, or reports from Collins regarding any allegations as to inappropriate touching concerning defendant. At a pretrial hearing an attorney for Concordia informed the trial court that there would be some objections to defendant's discovery request. Specifically, Concordia's attorney represented to the court that some of the material defendant requested "would be duplicative because it was all returned through the Grand Jury." The court ordered the requested materials brought to court so that they could "go through it and see exactly what [defendant] is entitled to and decide if everything or not or none or partial." The court stated if there was "material turned over to the

*** Grand Jury, and was tendered to [the defense] in discovery, then it is duplicitous." Concordia's attorney stated the university would be raising attorney/client privilege in opposition to the request for Collins's report. The court ordered Concordia to prepare a listing of the materials that had been submitted to the Grand Jury.

¶ 8    When the parties returned to court the attorney for Concordia represented to the trial court that it had prepared the listing of materials and that Concordia had complied with the subpoena stating "We believe our response for the Grand Jury Subpoena which asked for everything related to [A.C.] and [defendant's] misconduct has been tendered." The trial court noted that despite the language in the subpoena seeking documents related to "any individuals" the discovery response should be limited to matters related to A.C. and defendant's attorney agreed stating "If you want to limit it to [A.C.,] that's fine." The State stated it was also seeking Collins's investigation report of the investigation he conducted for Concordia. Concordia's attorney informed the court that when Concordia responded to the Grand Jury subpoena it "asserted privilege with respect to that report." The trial court confirmed that Collins "did a thorough investigative report for Concordia based on certain allegations" then ruled as follows:

> "Anything relating to the defendant and relating to perhaps an interview with the defendant or relating to [A.C.] should be before me. So if you have something from Collins that relates to that individual or those items that I just said, I should have it in terms of discovery, and [defendant's attorney] would be entitled to it. ***
>
> So what I am going to say is this. If we have to—you tendered in response to Grand Jury what you believe is proper. Now we are talking about a report by Mr. Collins which is separate and apart from the Grand Jury. You are

going to have to tender that to me.  I will review it and see what portions, if any,

are relevant to turn over to the defense.

\* \* \*

[A]ny documents that are generated by Concordia regarding this victim

and this defendant will be brought before me, I will review them and determine

whether, *in camera*, they are relevant and they should be disclosed or not."

Later in the pretrial hearing the trial court addressed defendant's attorney and reiterated that

"communications with 'any individual at any time' is irrelevant.  The only thing that I have

before me is [A.C.] and [defendant.]"  The court later concluded by informing defendant's

attorney "if you can say specifically that [A.C.] said something about activity with Person A, you

are entitled to it.  If you can say your defendant disclosed something to Person B because of this,

you are entitled to it."  The court continued the matter.

¶ 9       When the parties returned to the trial court the court ordered Concordia to turn over

Collins's report for an *in camera* review.  The court had explained that if Collins interviewed

defendant and took an audio statement from defendant and if Collins talked to A.C. then the

court would determine "whether or not there is anything of relevance that can be turned over to

the defendant."  Regardless, "if there are statements of the defendant that were given to Mr.

Collins, [defendant's attorney] is entitled to those."  The court ordered that if anything in

Collin's report was discoverable the court would "excise it and tender it to [defendant's

attorney.]"  The court stated: "What matters is, if [Collins] talked to the defendant and if he

talked to the victim.  And that's what I'm going to rule on."

¶ 10      The parties returned to the trial court in advance of the next court date.  Concordia had

failed to submit Collin's report and the trial court ordered its attorneys to turn over the report for

*in camera* inspection immediately. The court passed the case briefly and when the case was recalled Concordia's attorneys tendered the report to the trial court. The court stated it would perform an *in camera* inspection to determine whether the report contained discoverable material and if it did the court would provide what it deemed discoverable to the parties. At that time the parties would be allowed to argue for nondisclosure and the court would rule on those particular issues after it reviewed the report and determined what was discoverable. On the next court date the trial court stated it had completed its *in camera* inspection of the report and determined what it found to be discoverable. The court tendered the discoverable materials from the report to Concordia's attorneys and passed the case to allow them to review what the court tendered so that they could make any objections to disclosing the material to the State and to the defense. When the court recalled the matter Concordia's attorneys informed the court they would comply with the court's order that the material deemed discoverable after the *in camera* review be turned over to the State and to the defense; the attorneys for Concordia did ask for a protective order stating that the materials the court deemed discoverable would not be disseminated beyond the parties in the case.

¶ 11    The trial court gave the State and the defense copies of what it determined was discoverable. Defense counsel inquired about the possible existence of any contemporaneous notes Collins took of interviews. The trial court stated "If there's any notes that Mr. Collins made, not work product, but substantial notes that he took of the—although you have the transcript of his audio [(of Collins's interview of defendant)]. Now, if there's any notes that he took of the victim, you are entitled to that." The court ordered Concordia to identify any individuals who spoke to A.C. and any contemporaneous notes that are not work product relative to those communications.

- 5 -

¶ 12    Following the trial court's oral ruling that Concordia's attorneys identify any parties who spoke to A.C. and provide any contemporaneous, non-work product notes of those conversations, defendant's attorney sent a subpoena to Collins's law firm seeking "[a]ny and all notes or documents that you have which concern any communication that any individuals had with [defendant] and/or [A.C.] with regards to any physical, sexual and/or any interaction or communication that [A.C.] had with [defendant] at any time." That subpoena also sought "[a]ny and all documents that identify the names of any individuals that interviewed [A.C.] as referenced in your attached report." Concordia appeared in the trial court with a motion stating that Collins's notes of his interview of A.C. and defendant were work product. Defendant's attorney stated he was seeking information on any individuals Collins spoke to who had spoken to A.C. or defendant relative to the charges. The trial court stated: "if he talked to 70 people, that's not disclosable." The court stated it would not allow defendant "blanket material to *** whoever he spoke to and whatever they said." Defendant's attorney stated that was not what he was looking for. The court stated defendant's attorney was "asking for impeachment if [A.C.] said something other than what he's telling the State." Defendant's attorney responded, "That's one thing, or something that corroborates my client." The court asked, "So you're looking for any statements that were made by the victim to third parties that Mr. Collins may have spoken to?" Defendant's attorney responded: "That's the one thing I'm asking, and also, in order to get these documents into play ***." The court stated how it would proceed in the following colloquy:

> "THE COURT: I'm going to take it under advisement. I'm not going to rule on it, but I will read the materials you have. I will do that *in camera*, and I will have a decision as to what, if anything, would be relevant to you. I

understand your argument, okay? If [A.C.] said something -- and his attorney is right here. You can ask him, but if he said something to someone that is different than he's telling the State, you have a right to that. That's impeachment. Okay?

MR. HORWITZ: Yes.

THE COURT: If he says something that corroborates your client -- you may be able to use that when you testify, but bottom line is wholesale to everyone Mr. Collins talked to, no, that's not going to happen. I will review it for individuals, again, that Concordia is aware of, perhaps, that [A.C.] may have said something different to; and if that comes up, then, fine, I'll rule on it.

MR. HORWITZ: You don't mean Concordia? You mean the investigator for Concordia? Is that what you mean?

THE COURT: I'm using the generic term, meaning Mr. Warner, Mr. Collins, Concordia, the whole group, because they are part of the case right now, but that's what I mean, his investigative report."

¶ 13    Collins produced his notes of his interviews of A.C. and defendant to the trial court and confirmed those notes were separate documents from the report itself but "underlying [information] that got summarized into the report." Collins then asked for clarification as to his obligations under defendant's attorney's subpoena at which time the following exchange occurred:

"THE COURT: Basically what we're saying is if you are aware of any person that [A.C.] may have talked to that gave a different statement, one way or another. So that's one thing.

MR. COLLINS: Different statement --

THE COURT: In other words, if he said something to you, and he may have said something to another individual that you talked to. In other words, he said it was consensual, and he told a friend of his, and you talked to that friend, if that's there, we will see.

MR. COLLINS: So you are asking me, Judge, or ordering me to produce to your Honor the *in camera* inspection of any statements from [A.C.] that are inconsistent with what he told me?

THE COURT: That you are aware of, right.

MR. COLLINS: All I would be aware of is what my --

THE COURT: If that's it, that's it. I understand, Mr. Collins, totally. I will say this: I read the report. It was a very thorough report, but there were things in there, to be quite frank, that were not privileged. In other words, there were letters to the college community, etcetera. Those are not privileged.

MR. COLLINS: Those have all been produced.

THE COURT: Whatever you did, I understand, and I took that into account when I ruled on this. So what I will do is I will withhold ruling. I will read your motion. I will read the notice you have here."

¶ 14    Defendant's attorney objected to making Collins "the decision maker as to whether or not there is something impeachable or *Brady* [material.]" The trial court responded it would make the decision. Defendant's attorney pointed out that the trial court ordered Collins to disclose any statements Collins found inconsistent with A.C.'s statements. The court stated: "The bottom line is Mr. Collins talked to [A.C.] He told him whatever he told him. If Mr. Collins is aware of another individual that [A.C.] talked to and Mr. Collins talked to him and it was different, I will

look at that. That is something I believe is disclosable, and I think it's very clear." Defendant's attorney argued Collins should provide the material to the State to determine whether or not the material should be provided to the defense. The trial court restated its position that it was making the decision; the court would review what Collins tendered to the court and that if "there is someone that we know of that *** A.C. talked to that gave a different statement and that is somehow within [Collin's] knowledge, that would be disclosable. If it's not within his knowledge ***, if Mr. Collins in his review and in his interviews is not aware of that, then there's nothing to turn over; but to say that he's going to blanket turn it over to the State, no. Not at all." Collins sought clarification of the trial court's order whereupon the following exchange occurred:

"MR. COLLINS: Judge, I would like an order to reflect that -- if what I'm hearing your Honor saying—I will go through my investigative file and produce to the Court *in camera* any statement by any witness I interviewed, my team interviewed, that is inconsistent with what [A.C.] told me; in other words, that [A.C.] told a third party something inconsistent with what he told me?

THE COURT: Correct. That's exactly right.

MR. COLLINS: My understanding is that I am to excerpt that part of the interview and provide that to the Court *in camera*?

THE COURT: Exactly. That's exactly right."

¶ 15     Defendant's attorney argued before the trial court:

"MR. HORWITZ: So just the last tail bit I have to say is that -- I understand your Court's order. I understand you're overruling my specific objection relative to that point, and my point here is that there could be five

witnesses that he has in his possession right now that have something different to say than what was told to the State, and he doesn't know it. He has no idea, because he doesn't know what's in the State's hands. So in that regard, I would not be getting that information relative to those five individuals. There could be three. There could be two. There could be one. They could all be material witnesses, that have material evidence, and if he doesn't—all I'm asking is that he give everything that was said about [A.C.] and Lempesis. Not the whole kit and caboodle about everything. Just those statements where somebody said [A.C.] said this and Lempesis said that. If you get that--

THE COURT: If he is aware of anything different, he's going to tender it to me. That's clearly what the ruling is, and you made your record. That's it."

¶ 16    When the parties returned to court on this matter, the trial court stated the matter came to the court for it "to review certain things." In summarizing the proceedings to date the court stated that in addition to nonverbatim notes of interviews of A.C. and defendant defense counsel "wanted to know *** whether or not there was anyone that Concordia or Mr. Collins talked to that in effect said something different *** and whether or not that's disclosable." The court stated that defendant's attorney had subpoenaed those materials from Concordia and that Concordia had filed a motion to quash the subpoena. The court stated it granted the motion to quash in part. The court later explained that the subpoena was overbroad and "you're asking for basically everything. And the bottom line is they have a right to a privilege, and there's only certain things [that] are relevant for discovery."

¶ 17    The trial court stated that at the last court date "there were matters tendered to me of the interview of [A.C.,] as well as the interview of [defendant.]" The court stated the notes of the

interview of defendant were not relevant because defense counsel had received the full audio of the interview and the notes were "just the summary of that conversation." The court stated there was a one-page memorandum of the meeting with A.C. and that the court had "redacted it to the extent that I feel other matters don't—are not relevant or are matters of privilege." The court tendered the "one page statement redacted regarding the statement of [A.C.,] the victim, as given to Mr. Collins" to the State and to the defense.

¶ 18    The trial court went on to state that it had received from Concordia a letter from Collins of "other people they talked to." The court informed Concordia's attorney (Collins was not in court) that "[t]his is not compliance ***. This is clearly a violation." The court described what it received: typed notes of an interview of an athletic director and a memorandum from one of the attorneys' investigators but the documents were almost completely redacted. The court ordered Concordia "right now to tender those documents to me in full so that I can do the valid and proper *in camera* inspection." The memorandum from the investigator related to an individual the trial court knew from the record A.C. had spoken to. The court later said that if that person said that A.C. had said anything related to the charges whether it was consistent or inconsistent with what A.C. said at another time then the defense was entitled to it.

¶ 19    On the next court date the trial court stated it had received the unredacted documents and that that the partial statement given by the individual to the attorneys' investigator was disclosable. The statement related to a conversation between A.C. and that individual: Mr. Jason Jusk. The court stated it had also learned from Collins that Collins interviewed defendant twice and the defense had received the audio recording of only one; thus the court held that the summary of Collins's interview of defendant to the extent it is different from the audio recorded interview was also disclosable. The court tendered the written notes of Collins's interview of

defendant (which was "redacted to some extent") and the report of the conversation between Concordia and Jusk to the State and to the defense. The court stated that at that time it believed "Concordia has now tendered to me all of the information that they believe is privileged, but I think is something that I need to do *in camera*'s on." After tendering the documents, the court stated:

> "Is there anything else that possibly this Court would have to review that Concordia feels might be privileged? Is there anyone else that was talked to by Concordia that may have—
>
> Did you guys have any knowledge that the defendant may have said something different or those people said something different to the victim, [A.C.,] or if [A.C.] said anything different to them? Anything at all that you're aware of."

¶ 20 Collins informed the court that he had gone through the investigative file and looked for "any statements that were made by [A.C.] that were arguably inconsistent with what [A.C.] told me." Collins stated he believed he had complied with everything he was ordered to do. The court asked: "But is there anything else that anybody knows about that [A.C.] has said that you're aware of to someone else different than what [A.C. has] already said in the documents here?" Collins responded, "Not based on my investigation." The trial court then addressed A.C.'s attorney and asked if she was aware of "anything where [A.C.] may have said something different to anyone? *** [A]re you aware of any statement [A.C.] made to anyone *** that is different than anything he said to either the Concordia investigators or to the State?" A.C.'s lawyer stated she had not received what A.C. said to Concordia. The court initially stated the State and Concordia could provide A.C.'s attorney with those statements but the parties raised

concerns about a protective order that the court entered regarding those materials. The court stated that defense counsel had asked "that there be disclosure of anything regarding statements made to parties that anyone is aware of regarding something different [A.C.] said." The court continued: "If there is anything that is non-work product, that is non-privilege that anybody is aware of where [A.C.] has made a separate statement, whether it's to the police or anyone else, I want to know about it because the defense is entitled to it." The trial court stated it would allow an exception to the protective order to permit A.C.'s attorney to see the materials so that she could disclose any statements by A.C. she was aware of that were inconsistent with other statements A.C. had made.

¶ 21     Defendant's attorney addressed the trial court. Defendant's attorney stated "I have not asked for something different. The qualifier you're putting on the disclosure is that it needs to be something different. I haven't asked for something different. You ordered to do something different." Defendant's attorney stated he "made a broader request relative to things that have been said." The court responded it was going to give the defense what it was entitled to. During that colloquy the following exchange occurred:

> "MR. HORWITZ [Defendant's attorney]: Okay. So I understand—So the
> first thing is I want to make it clear, for the record, that what you've asked—what
> you said I asked for is not what we've asked for. It's your ruling relative to what
> I've asked for and how it should be holding down.
>
> THE COURT: Exactly. Relative to all the matters in terms of privilege, in
> terms of discovery, in terms of *in camera* and what I believe you're entitled to."

Defendant's attorney asked to memorialize his objection in writing and the trial court stated that he could. The parties further discussed what materials A.C.'s attorney would be reviewing to

ascertain if she was aware of any inconsistent statements by A.C. The trial court ruled A.C.'s attorney "can inspect the statements that [A.C.] made *** to Jason Jusk. *** And if there's anything she's aware of that [A.C.] said anything different, fine."

¶ 22 On the next court date A.C.'s attorney informed the trial court she was aware of statements A.C. made that were different from what had been previously disclosed. A.C.'s attorney explained "[t]hese were matters that were said to Concordia's investigator that I know to be contrary." On the next court date A.C.'s attorney informed the court:

> "I am aware of three instances where there is contrary statements. One is in our second amended complaint of law. One is a document from a psychological exam that was done that we are claiming is work product privilege. And then there are also records that we have, bills that we have from treatment with the psychologist.
>
> In addition, there were three media interviews that were conducted. I believe that – I wasn't present for those interviews so I don't know if there were contradictory statements in there ***."

¶ 23 The trial court stated that it would review what A.C.'s attorney submitted and that "[i]f there is anything to the contrary that [A.C.] has said, and he has told someone that and disclosed that, that is possibly something that would be disclosed to the defense for discovery." On the next court date the trial court informed the parties it had completed its *in camera* review of the materials submitted by A.C.'s attorney consisting of a report of a psychological exam and bills from a psychologist. The court stated the psychologist's report was privileged under the Mental Health and Developmental Disabilities Code and HIPAA. The court noted that the psychological exam began by stating that it was a nonconfidential interview. The court redacted the

psychological report and tendered copies to the State and to the defense. The court stated there were "statements made by [A.C.] Possibly one or two of the statements *** could be determined to be something of a contrary nature. Possibly. All the other statements are consistent, as I find, with all the discovery and what he's already said per the investigation with Mr. Collins, Perkins [Coie], and per the investigations as related to me thus far." The court stated with its tender "I believe that closes discovery."

¶ 24    The following is taken from A.C.'s testimony at defendant's trial. A.C., who was 28 years old at the time of trial, grew up in Melrose Park. His mother worked at Concordia University in River Forest. When A.C. was ten years old he played Little League Baseball. When A.C. was 10 his mother took him to a pitching camp that Concordia was hosting and that is when he met defendant. (Defendant was the baseball coach at Concordia University.) When A.C. was fifteen his mother arranged for defendant to give A.C. pitching lessons. Defendant told A.C. that defendant could help A.C. to become an elite player and that he could help A.C. to get drafted by a major league baseball team. Defendant offered to continue to give A.C. pitching lessons. The lessons began in the winter when A.C. was 16-years old.

¶ 25    Defendant picked A.C. up for the pitching lessons at A.C.'s home and took A.C. to a gymnasium at Concordia. The lessons occurred somewhere between 9:00 and 10:00 p.m. and lasted for one to two hours. Sometimes A.C. would throw pitches to a student at the university and other times he would pitch into a "sock knot." When there was a live catcher that person would only stay while A.C. threw until it was time for defendant and A.C. to talk about the lesson.

¶ 26    The first time "something unusual" happened with a lesson was when defendant got A.C. sliding shorts.[1]  Defendant and A.C. were alone in the pitching area in the gym.  Defendant told A.C. he wanted A.C. to try on the shorts to fit them.  Defendant asked A.C. to completely undress to try on the shorts.  A.C. undressed and stepped into the shorts.  Defendant "helped slide them up on [A.C.'s] body and was caressing [his] butt and genitals when he did that as well."  Defendant caressed A.C. both over and under the sliding shorts.  Later in his testimony A.C. stated that during this incident defendant told A.C. he was good looking and asked him what A.C. thought about when he masturbated.  A.C. was 15 or 16 at the time.

¶ 27    The second time something happened defendant wanted to fit A.C. for a jock strap. Defendant again asked A.C. to fully undress.  A.C. stepped into the jock strap and defendant slid it up.  A.C. testified defendant was "caressing by butt and my genitals with his hand" as he slid up the jock strap.  Later in his testimony A.C. stated defendant "was talking about like—that he liked how I looked, my body" and defendant asked A.C. about whether or not he masturbated.

¶ 28    A.C. testified the third time something unusual happened defendant did not touch A.C. but A.C. was pitching into a windsock while defendant filmed him and defendant "had his hand in his pants and he was masturbating."

¶ 29    A.C. testified about another incident in which, after a pitching lesson, defendant told A.C. he was not going to take A.C. home because A.C. was too dirty and could not get into defendant's car when A.C. was sweaty and smelly.  Defendant told A.C. he had to go take a

---

[1]    "Sliding shorts.  Padded support shorts sometimes worn to protect the thighs when the player slides into the bases.  Some sliding shorts contain a pocket for a protective cup.  This is so the player does not have to wear a jockstrap and sliding shorts at the same time, although many players find the cup is held in place better by wearing it in a jockstrap under sliding shorts." https://en.wikipedia.org/wiki/Baseball_clothing_and_equipment (visited October 11, 2019).

shower. No one else was in the shower room. Defendant got into the shower stalls with A.C. As A.C. showered defendant started caressing his leg and soaping up A.C. A.C. testified that as this occurred defendant placed his finger inside A.C.'s anus. A.C. told his mother but she called him a liar and "it was written off like it never happened." A.C. later testified that during each incident defendant had an erection. After this incident A.C. did not continue to receive pitching lessons from defendant while A.C. was in high school.

¶ 30    A.C. testified he had financial concerns about attending college and Concordia offered him free tuition because his mother worked there. He also knew he would be playing baseball and that he would be playing for defendant. A.C. testified he thought he could handle it. When A.C. arrived at college for baseball camp he was 17 years old. A.C. met with defendant in defendant's office. After they discussed baseball defendant asked A.C. if A.C. "wanted to participate in a video with him" and he also asked A.C. "about taking a shower" with defendant. After they spoke about it A.C. left and returned to his dorm room.

¶ 31    During an on-the-record sidebar the trial court ruled that any testimony about anything that occurred that is not the subject of the indictment against defendant would only be to corroborate a continued course of conduct. "But certainly, anything that occurred after [A.C.] became 18 years of age is not the subject of these criminal charges."

¶ 32    When A.C. resumed testifying he testified that in August or September 2007 when A.C. was 17 years old he did shower with defendant and defendant touched A.C.'s butt and genitals with his hand.

¶ 33    A.C. testified that during his time at Concordia defendant offered to sell him baseball equipment. Defendant also controlled who went on baseball trips and who played on those trips. Defendant kept a ledger of how much players "owed for their trip, their equipment, and

miscellaneous items." When A.C. played baseball he could not afford to pay so defendant carried him on the books. When asked what kinds of things he would be able to do to deduct money on the ledger A.C. testified:

> "The videos was what I ended up doing to receive playing time and it was to further my baseball career because he had made the promise that I could—he would help me get drafted, help me become a professional baseball player if I did this for him because it was helping him out, also.
>
> And that if I didn't do it and if I ever spoke to anybody about it, he would deny it, he would make my life a living hell, and I would never play baseball again were his exact words to me."

A.C. testified that after his freshman year defendant attempted to engage A.C. in further sexual acts. When asked what those acts were A.C. testified:

> "It was—he said he had some—a friend in the porn industry in California and that he was requesting videos and that if I were to do these videos, he would make sure I got the playing time and he would get scouts out there.
>
> He would also take money off the books that I owed for equipment or for my trip or for anything else, and he also gave me about $50 cash for each one so I could have pocket money."

A.C. testified he performed several acts on video with defendant. The trial court reiterated that it would regard testimony regarding the videos as corroboration.

¶ 34    A.C. testified he engaged in multiple sexual acts on video during his freshman and sophomore year of college. Defendant told A.C. how much money he would deduct from A.C.'s ledger for each video. At the end of his sophomore year or beginning of his junior year

defendant asked A.C. to have intercourse. A.C. refused and they never had intercourse. A.C. testified that as a result his baseball playing time and opportunities suffered.

¶ 35    A.C. testified that during his senior year of college he had a conversation with another player followed by a conversation with the assistant baseball coach at Concordia. After the conversation with the assistant coach defendant was fired.

¶ 36    A.C. graduated college in 2011. He married and moved in with his wife's family. A.C. told his wife what happened at Concordia.

¶ 37    After A.C. told his wife, his wife's parents approached A.C. about filing a civil lawsuit against defendant. They put A.C. in touch with an attorney and A.C. filed a civil complaint against defendant.

¶ 38    After A.C. obtained legal representation for a civil suit against defendant the River Forest Police Department contacted A.C. A.C. met with a detective and told the detective what happened to A.C. at Concordia. A.C. testified he viewed five hours of unedited video at the police station. The head of the person in the video was not visible but A.C. identified himself in the video from a birthmark and tattoos. The detective printed still photos of images from the video. The defense objected on the ground the videos all occurred after A.C. was 18 years old. The trial court overruled the objection stating the testimony regarding the video was "only being introduced as possible corroboration." The State showed A.C. pictures and he identified himself in photos taken from images in the video.

¶ 39    The State sought to play the video at defendant's trial. The defense objected on the ground the pictures had been introduced, the video occurred after A.C. was 18 and depicts events not charged in the indictment, and the video would be cumulative. The trial court sustained the defense's objection. The court ruled A.C. had identified the still photos as corroborative and that

the court had already ruled that there was a limited purpose in allowing A.C.'s testimony about the video and still photos. The court ruled that A.C. had testified to the video and certain acts that occurred while he was an adult and that were not alleged to have occurred during the time period alleged in the indictment. The court concluded:

> "He's testified to four other acts or four other instances that occurred when he was younger. But he's not testified to anything regarding the video on the younger days.
>
> So quite frankly, it appears to me not only is the video cumulative but even though the testimony is introduced for a limited purpose, I believe that the video—your objection should be sustained and you're not going to put the video in."

¶ 40 A.C. testified that during the incidents while A.C. was in high school he would just freeze. A.C. described that to mean "I couldn't talk. I couldn't really think. I was blank. I just wanted it to be over, so I just stood there and hoped that it would be. And it was severe anxiety. I sweat. I just—I freeze. I can't talk. I can't do anything or move. It's like I'm a statue."

¶ 41 A.C. testified he was contacted by Patrick Collins. A.C. told Collins what happened in two conversations. The first conversation was in-person at Concordia and lasted ten to fifteen minutes. No one else was present during the in-person meeting. The second conversation was by telephone and lasted five to ten minutes.

¶ 42 A.C. also testified that he had sought counseling and had spoken with several counselors.

¶ 43 On cross-examination defendant's attorney began to ask A.C. about his relationship with his mother. Defense counsel asked A.C. "if there was anybody you could confide in, that would be your mother; is that correct?" and "you were clear that you spoke to your mother about the

incident—incidence [*sic*] that took place with [defendant;] is that correct?" A.C. began to answer but defense counsel interjected and the State objected. The trial court admonished everyone to stop when there is an objection and to allow the witness to finish their answer. The court sustained the objection and stated "Let the witness finish his answer." A.C. then continued: "Yes, I recall that because after all the therapy that I've done with my repressed memories remembering all that stuff, that's how I recall all of that—." Defense counsel attempted to interrupt but A.C. continued: "—the four instances that I had with [defendant] and recalling the time I had spoke with my mother right after." Defense counsel then stated: "Judge, I move to strike the words suppressed memory and I move to strike the words—." Before defense counsel finished the trial court ruled "The objection is overruled. You asked the question. He answered it as best he could. It's overruled." Defense counsel continued his cross-examination.

¶ 44    Defendant's attorney asked A.C. about his conversation with the River Forest Police Department detective in March 2015. A.C. testified his civil attorney and an Assistant State's Attorney were present when A.C. spoke to the detective. A.C. testified he told the detective he did not tell his mother about what happened between A.C. and defendant because he was too embarrassed to tell his mother. A.C. could not recall whether or not he told the detective about the incident with defendant in the shower. Defense counsel asked A.C. about his civil lawsuit. A.C. testified he had not read the complaint or the lawsuit. A.C. also testified on cross-examination that he began therapy as soon as he got out of college. Defense counsel asked A.C. if the first therapist he saw was Dr. Ostrov and A.C. responded he had seen Dr. Ostrov and "several therapists or counselors." Defense counsel asked A.C. for the name of another therapist he saw and A.C. testified he could not remember that therapist's name. A.C. could not recall the

names of any of the "several" therapists he saw in 2011 and 2012 other than Dr. Ostrov. Defense counsel asked A.C. if A.C. had told the detective that A.C. had seen Dr. Bylsma and A.C. agreed that he had seen Dr. Bylsma a few times. A.C. could only state that he had seen Dr. Bylsma sometime between 2011 and 2015.

¶ 45     A.C. testified on cross-examination that when he met with the Dean of Concordia University shortly after speaking to the assistant baseball coach he did not tell the Dean about anything that happened between A.C. and defendant when A.C. was a minor. Defense counsel asked why A.C. had not told the Dean about those incidents when A.C. was a minor and A.C. responded "Because they were repressed memories, sir." Defense counsel objected and the trial court asked A.C. if he understood the question. A.C. responded he did and the court instructed him to answer. A.C. asked for the question to be repeated. Defense counsel asked A.C. if, at the time he spoke to the Dean of Concordia University, he knew that defendant had touched him as a minor. A.C. responded "No, because I answered that previously for you." After some additional back and forth, defense counsel again asked "When you spoke to Dean Hines, did you know at that time that you had been touched by [defendant?]" A.C. answered "No, I did not recall." Defense counsel asked A.C. if he told the assistant coach that there were incidents that took place between A.C. and defendant when A.C. was a minor and A.C. answered "no." A.C. attempted to continue with his answer and stated in part "It's no because, when I only spoke with my therapists and counselors after I got—" but defense counsel objected that the balance of the answer was nonresponsive to his question. The court ruled A.C. had answered his question "no" and told defense counsel to move on.

¶ 46     Later in the cross-examination defense counsel asked A.C. if Patrick Collins asked him whether defendant ever touched A.C. when A.C. was a minor. A.C. stated Collins did not ask

him that. A.C. testified that when he spoke to Collins the second time on the telephone he became frustrated with Collins because Collins was asking questions in an accusatory manner so A.C. hung up and never spoke to Collins again. A.C. also testified that his mother helped him decide what college to go to and that prior to that decision he had told his mother, "as I recalled after seeking counsel after I graduated college," that defendant had touched him.

¶ 47 A.C. testified that he spoke to a reporter after his civil suit was filed and he did not tell that reporter about any touching by defendant when A.C. was a minor.

¶ 48 A.C. also testified on cross-examination that he received payment for the videos he made with defendant. A.C. testified he "was only given probably about $50 in cash for each film. And then [defendant] said he was taking money off of my equipment fee and what I owed for traveling. [Defendant] never gave me a specific dollar amount for that." A.C. testified he did not tell Collins he received between $400 and $2200 for the videos. A.C. testified he did not give Collins a dollar amount. "I just gave him the gist of it. *** I said I received some *** cash for the films. It was about $50 each time."

¶ 49 On re-direct examination the State asked A.C. when he first remembered "this assault." A.C. testified he first remembered it "after college when I saw my therapist." The State asked A.C. to describe how it happened that he remembered this. A.C. testified:

> "I explained to them the situation of what happened to me and then we started talking about that I had received lessons from him when I was 15, 16, and we started getting into stuff about that.
>
> They asked me questions about, you know, trying to remember about the pitching lessons and what I could recall, and we kind of—just kept going into detail about that, and I started recalling more and more each time we had spoken

about it because it was so frequent and it was always on my mind. And that's when I started to really recall everything."

Defense counsel did not object to this testimony.

¶ 50    Defendant called Patrick Collins to testify. Collins testified that Concordia hired his law firm to conduct an internal investigation following defendant's dismissal from the university. The investigation team spoke to an excess of 40 people as part of the investigation. Collins personally spoke to fewer than half of them. Collins did speak to A.C. in November 2012. Collins testified that to the best of his recollection A.C. told Collins that "over a multi-year period while [A.C.] was a student athlete at Concordia he would be paid between $400 and $2200 by [defendant] for engaging in certain sex acts." Collins understood that to be the amount per sex act. Collins also testified that part of his investigation was to determine whether there was abuse that predated when defendant was the coach or predated when the players were on the team. Collins asked A.C. when he first met defendant and "specifically whether there was any abuse at the hands of [defendant] when he was a participant in the baseball camp as a ten-year old, and [A.C.] said no." Collins testified he asked A.C. "did he have any other contact with [defendant] prior to becoming a student athlete at Concordia, and [A.C.] responded that he did have contact with [defendant]" as a private pitching coach when A.C. was a high school baseball player. Collins asked A.C. in that context "was there any abuse of any sort of any kind, and [A.C.] said no." Collins testified that A.C. indicated to Collins that the abuse began when A.C. was a freshman student athlete.

¶ 51    On cross-examination, Collins testified he attempted to speak to A.C. again but they did not have a second substantive interview. Collins agreed he did not get A.C.'s full story during their first interview. At that time Collins was trying to build a rapport with A.C. Collins also

testified that with regard to the payments A.C. received, Collins did not believe A.C. said cash but it was his "operating assumption" that it was cash. Collins testified he was aware of some documentation regarding certain payments and that A.C. told him that A.C. had gotten into debt to defendant and that some of that debt was for gear. Some of the payments to A.C. "in part were working off that debt."

¶ 52 On redirect examination Collins testified that "As to the private pitching lessons, my notes say nothing sexual or inappropriate occurred at any time."

¶ 53 Following trial and arguments by the parties, the trial court made oral findings before giving its verdict. The court stated in part:

> "The only issue that this Court has to decide is did the abuse take place when [A.C.] was a minor. In other words, was [A.C.] credible?
>
> * * *
>
> It appears that [A.C.] testified that during the course of those [pitching] lessons there was the initial sexual contact. At the time based on the evidence he was either late 15 or early 16 years of age.
>
> He indicated that on one occasion he did shower with the defendant, and the defendant apparently inserted his finger into his anus. He did admit he didn't tell anyone. He did admit that later on there were offers of money for sex acts.
>
> Now, whether he received $400 or $2,200 or $50, as he said, is really not the issue, because—it effects his credibility. There's no question. But that is as an adult, and whether or not those were consensual acts is a separate issue.
>
> * * *

At the time he was in treatment when he spoke to Mr. Collins. He identified the photos of himself on the video. And, again, the video basically is adult situations. And how abhorrent it is, the videos are adult situations, and I kept that out.

The only reason testimony was allowed regarding the video was corroboration possibly of [A.C.'s] earlier statements and why he would participate in sex acts.

* * *

It is clear from the evidence that [A.C.] met [defendant] when he was a minor.

* * *

[H]e did admit to talking to the sergeant. [The sergeant] from the police department on March 11 of '15. And he did admit at some point that he did not exactly tell the sergeant everything that occurred.

*** [H]e indicated that he didn't tell his mother, first of all, because he was too embarrassed. He later said he did tell his mother.

*** He didn't tell or recall telling [the sergeant] about being in the shower with [defendant.] He says he told the sergeant what he recalled at the time.

* * *

He indicated he had repressed memories. He did speak to [Assistant Baseball] Coach Smith about the video. He did not explain every single thing that he did. When he talked to Dean Hynes, he was never asked about being touched as a minor. [A.C.] said no.

[Assistant Coach] Smith never asked about what happened in the past. He indicated that only when he spoke to counselors did he recall what happened.

* * *

Again, those videos and whether any payments were made effect his credibility, but they do not effect anything in terms of the trial. Because those are consensual supposedly and matters that occurred as an adult.

Although sexual contact between a coach and a student athlete is abhorrent, reprehensible and improper, such contact between consenting adults is not illegal. Indeed, it is not charged in the indictment before this Court.

The question that this Court kept asking itself in terms of whether or not I believe [A.C.] and whether or not these acts occurred is why would the defendant choose [A.C.] to engage in sexual conduct on the videos as an adult? In other words, why would he choose [A.C.] and not another member of the baseball team?

It is my opinion, after considering all the evidence, that these videos and the content may have occurred when [A.C.] was a freshman. But, in fact, I find that the sexual activity escalated. I find that the persona of the defendant was the sole male role model in [A.C.'s] life. And I find that [A.C.] thought that whatever he participated in would be his route to a successful perhaps major league baseball career.

He was the most vulnerable. If we believe [A.C.] that the acts occurred in high school, he was the most vulnerable person, and he was the one who

[defendant] believed would not say anything. I believe that activity corroborates what he said on the stand.

* * *

But I will say it seems to me that Concordia University was more concerned about what happened while these videos and the sexual activity occurred on their campus than what happened to [A.C.] and [defendant] prior.

So, again, the issue is credibility of [A.C.,] and this Court finds [A.C.] is credible."

¶ 54 Following additional comments about the testimony regarding the specific acts charged the trial court found defendant guilty of Counts 1, 2, and 3 of the indictment and not guilty of Count 4. The court denied defendant's motion for a new trial or judgment of acquittal.

¶ 55 This appeal followed.

¶ 56                                    ANALYSIS

¶ 57 Defendant raises several arguments on appeal. They are: (1) pretrial "irregularities" by the trial court amounted to a deprivation of due process and reversible error, (2) the trial court committed reversible error in limiting the scope of cross-examination of A.C., (3) the trial court committed reversible error in relying on evidence of videos involving defendant and A.C. that took place after the dates alleged in the indictment, (4) the trial court committed reversible error by relying on expert testimony proffered by a lay witness, and (5) the State failed to prove defendant guilty beyond a reasonable doubt. We will address each argument in turn.

¶ 58                          (1) Pretrial Proceedings

¶ 59 First, defendant argues the trial court erroneously limited the scope of the subpoena *duces tecum* sent to Concordia. Defendant argues that the trial court erroneously kept from him "the

identities of approximately forty witnesses and their statements made to Collins during his investigation." Defendant also argues the trial court committed reversible error by "delegating discovery to a third party" when it ordered (1) Collins to examine his notes of interviews and turn over any statements by A.C. to anyone Collins interviewed that "Collins deemed 'inconsistent' with what [A.C.] stated during the criminal proceedings" and (2) A.C.'s civil attorney to examine Collins's report "and identify statements that were inconsistent with what [A.C.] had told her." Defendant argues the trial court's course of action amounted to an abdication of the trial court's judicial authority which is *per se* reversible error (see *People v. Vargas*, 174 Ill. 2d 355 (1996)); and prevented the State from fulfilling its duties under *Brady v. Maryland*, 373 U.S. 83 (1963), which left the defense "without an avenue to discover exculpatory information that the Assistant State's Attorney would normally have a duty to turn over." Defendant also argues that there is no law that "provides that the production of documents in discovery *** is limited to whether or not a witness made a statement that was inconsistent to testimony proffered by a complaining witness." In addition to the disclosure of the full Collins report defendant asks for the alternative relief of an order that the trial court "review the documents for all exculpatory information, not just inconsistent statements made by [A.C.]"

¶ 60    Defendant also argues the trial court erroneously kept A.C.'s medical bills and "the full version of the psychological report" from defendant. Regarding the psychological report defendant argues that withholding the full report "subjected [d]efendant to a fundamentally unfair trial" because the court allowed A.C. to testify that he had repressed memories while leaving defendant without an avenue to attack that testimony.

"The use of subpoenas is a compulsory process for obtaining witnesses or documentary evidence in all criminal prosecutions and is guaranteed by the sixth amendment. [Citations.] A subpoena is separate from the rules of discovery. [Citation.]

To justify a pretrial subpoena, a defendant must show that (1) the documents are evidentiary and relevant, (2) the documents are not otherwise procurable reasonably in advance of trial by the exercise of due diligence, (3) the party cannot properly prepare for trial without production and inspection in advance of trial and the failure to obtain an inspection may tend to unreasonably delay the trial, and (4) the application is made in good faith and is not intended as a general 'fishing expedition.' [Citation.] Any material sought by subpoena is to be sent directly to the court rather than the party who caused the subpoena to issue. [Citation.] The court then reviews the documents *in camera* and decides whether the documents are relevant, material, or privileged and whether the request is unreasonable or oppressive, prior to allowing the moving party to view the subpoenaed material. [Citation.] A court should grant a motion to quash a subpoena if a request is oppressive, unreasonable, or overbroad. [Citation.]"

*People v. Mitchell*, 297 Ill. App. 3d 206, 209 (1998).

¶ 61    As previously stated, defendant's subpoena to Concordia requested "[a]ny and all documents, statements, reports, *** [or] investigation *** pertaining to any information of alleged inappropriate touching and/or communication that [defendant] allegedly had with any individuals at any time. This includes any investigation by any individual concerning alleged misconduct committed by [defendant.]" The subpoena also sought any writings, documents, or

reports from Collins regarding any allegations as to inappropriate touching concerning defendant. Defendant's subpoena to Collins's firm similarly sought "[a]ny and all notes or documents that you have which concern any communication that any individuals had with [defendant] and/or [A.C.] with regards to any physical, sexual and/or any interaction or communication that [A.C.] had with [defendant] at any time." The subpoena to Collins's law firm also sought "[a]ny and all documents that identify the names of any individuals that interviewed [A.C.] as referenced in your attached report." The trial court found these requests overbroad.

¶ 62    The question for this court is whether the trial court committed reversible error when it effectively limited defendant's subpoenas to a request for witnesses with knowledge of prior inconsistent statements by A.C. We find that it did.

¶ 63    It is "established that the permissible breadth of *** a subpoena depends upon and is measured by the subject matter and the scope of the problem under investigation. [Citation.]" *People v. Lurie*, 39 Ill. 2d 331, 335-36 (1968). "[T]he issuance of a pretrial subpoena requires, among other things, that the documents sought be evidentiary and relevant." *People v. Williams*, 267 Ill. App. 3d 82, 87 (1994). " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ill. R. Evid. 401 (eff. Jan. 1, 2011). A subpoena seeking relevant, material, nonprivileged documents related to the offense charged that is not overbroad, oppressive, or unreasonable should be granted. See *Mitchell*, 297 Ill. App. 3d at 209, see also *People v. Popeck*, 385 Ill. App. 3d 806, 811 (2008) ("Because access to defendant's medical records solely for the date of the accident is relevant, material, and not privileged, the subpoena was sufficiently limited in scope and should have been granted.");

*People v. Allen*, 410 Ill. 508, 515-16 (1951). "The trial court has broad discretion in ruling on issues of relevance and materiality and its determination will not be disturbed absent an abuse of discretion." *Williams*, 267 Ill. App. 3d at 87.

¶ 64    In *People v. Shukovsky*, 128 Ill. 2d 210, 215 (1988), the defendant was charged with battery of his former spouse. The defendant served a subpoena *duces tecum* on a social worker working for the Lake County State's Attorney's Office seeking all materials related to conversations she had with the complaining witness or with members of the Lake County State's Attorney's Office or any police agency. *Id*. at 216. The trial court ordered the social worker's supervisor, an Assistant State's Attorney (ASA) to comply with the subpoena after denying his motion to quash the subpoena. *Id*. The ASA moved to quash the subpoena on the grounds it was overbroad and not subject to the subpoena because of the work-product privilege, among others. *Id*. The ASA refused to comply and the trial court held him in contempt of court. *Id*. (Our supreme court later found the ASA's contempt was "purely a formal one *** to permit, through an appeal, examination of a question, the answer to which was not free from doubt" and vacated the order holding the ASA in contempt. *Id*. at 231.)

¶ 65    On appeal, the ASA argued the order directing him to comply with the subpoena was invalid because the defendant had not made a "sufficient showing to entitle him to the use of the subpoena." *Id*. at 222. The ASA argued that the defendant's sole purpose for obtaining the materials sought by the subpoena "was to challenge the credibility of the complainant." *Id*. at 226. The ASA argued "that under [*United States v.*] *Nixon*, [418 U.S. 683, 701-02 (1974),] the need for impeachment evidence is generally insufficient to require its production in advance of trial." *Id*. Our supreme court disagreed. *Id*. The court also held that it appeared "from the language in the defendant's motion to dismiss that the defendant's purpose in seeking the

material described in the subpoena, however, was not simply to obtain information to impeach the testimony of the complainant." *Id.* The court found the defendant "also sought to establish that the State's Attorney was abusing discretion in bringing the charges against him." *Id.* The State's attorney had previously "*nol-prossed* identical charges *** for 'insufficient evidence,' and then later refiled the charges." *Id.* The court found "[t]he defendant may reasonably seek to determine what caused the State's Attorney to refile [the] charges." *Id.* In that case the court held the defendant "made a sufficient showing entitling him to the materials called for in the subpoena and that the [trial] court's denial of the motion to quash was proper." *Id.*

¶ 66 In this case the State argues defendant "failed to show that he acted in good faith and sought only relevant documents" because the wording of the subpoena encompassed documents relating to "inappropriate touching and/or communication that [defendant] allegedly had" with individuals other than A.C. The State also argues the trial court "correctly applied the work product privilege to Collins's notes of his witness interviews." "[W]ork product is '[m]aterial prepared by or for a party in preparation for trial,' and it 'is subject to discovery only if it does not contain or disclose the theories, mental impressions, or litigation plans of the party's attorney.' Ill. S. Ct. R. 201(b)(2) (eff. Jan. 1, 2013)." *Doe v. Township High School District 211*, 2015 IL App (1st) 140857, ¶ 112. "[O]rdinary work product is freely discoverable ([citation]), and it is defined as any relevant material generated in preparation for trial which does not disclose conceptual data ([citations]). By contrast, [o]pinion or core work product is defined as materials generated in preparation for litigation which reveal the mental impressions, opinions, or trial strategy of an attorney. [Citations.]" (Internal quotation marks omitted.) *Id.* ¶ 113. "With respect to memos made by counsel, our supreme court has distinguished between: memos made by counsel of his or her impressions of a prospective witness, which are protected;

and verbatim statements of the witness, which are not." *Id.* ¶ 114. In this case, the State argues there is nothing to suggest that Collins's notes of his witness interviews were verbatim statements by the witnesses. The State asserts the trial court was "well aware of its obligation to redact only privileged and irrelevant material" and cites record statements by the trial court that it would determine whether materials are work product. The State argues defendant has offered no reason to think the trial court's rulings in that regard were an abuse of discretion.

¶ 67    The trial court reviewed Collins's report to Concordia *in camera* and turned over the portions deemed non-privileged to defendant. Defendant has failed to demonstrate reversible error with regard to the report itself. That report is not contained in the record on appeal.

¶ 68    However, the subpoena to Collins's law firm was limited to communications with defendant or A.C. regarding physical or sexual interaction and communications between defendant and A.C. The State also cites defense counsel's response to the trial court's concern about individuals other than A.C. that limiting the subpoena to documents related to defendant and A.C. would be "fine." However, the trial court did not simply limit defendant's request to information pertaining to defendant and A.C. Instead, the trial court limited defendant's request to A.C.'s inconsistent statements pertaining to defendant and A.C. We hold the trial court erred in failing to conduct an *in camera* inspection of the other investigatory materials related to A.C. and defendant generated by Collins's report including Collins's notes of interviews of witnesses other than those Collins identified pursuant to the trial court's order, and the court erred in limiting materiality and relevance for purposes of defendant's subpoenas to inconsistent statements by the complaining witness.

¶ 69    Based on our review of the record, the trial court did not conduct an *in camera* review of Collin's notes of interviews other than interviews Collins believed involved an inconsistent

statement by A.C. The portions of the proceedings the State cites for the trial court's statement that it would determine whether materials constituted work product was a discussion about Collin's final report, Collins's interviews of defendant and A.C., and the notes of witness interviews *Collins determined* involved inconsistent statements by A.C. In the same portions of the record the State relies upon, defendant's attorney informs the court that in addition to the final report, Collins is in possession of "investigation materials," and references the witnesses Collins spoke to in his investigation. The court responded that materials related to "other minors" was not relevant and would not be discoverable. However, the court did not discuss witness interviews pertaining specifically to defendant and A.C., which is what defendant sought with his subpoena. On appeal, defendant has set forth a number of ways in which the materials sought by the subpoena in this case could have been probative of relevant facts. The State makes no argument those interviews are not relevant to the charges against defendant.

¶ 70 The trial court should have conducted an *in camera* inspection of Collins's notes of interviews of witnesses described above beyond merely those notes of those interviews Collins and A.C.'s attorney believed led to inconsistent statements by A.C. to determine whether they contained work product and, if not, whether they were relevant and material to the offenses charged. Absent such a determination by the trial court there is no showing of cause for denial of disclosure of that information and we believe defendant has demonstrated that the material is relevant and material. See *People v. Nunez*, 24 Ill. App. 3d 163, 171 (1974) ("Defendant was entitled to a prompt determination of his motion on the merits so that he could prepare his defense accordingly. No showing of cause was made, consistent with Rule 415(d) [citation], which would have permitted the court to defer the disclosure."), Ill. S. Ct. R. 412(h) (eff. Mar. 1, 2001), Committee Comments ("discovery will only be allowed when defense counsel can show

that what he seeks is material to the preparation of the defense"); 415(f) (eff. Oct. 1, 1971), Committee Comments ("In issuing protective orders under paragraph (d), allowing excision of portions of material under paragraph (e), or in otherwise deciding that certain material is not subject to disclosure, the trial court must have an opportunity to examine, in private, the particular material as well as the reasons for non-disclosure.").

¶ 71   An error in quashing a subpoena is subject to a harmless error analysis. See *People v. Ward*, 13 Ill. App. 3d 745, 752 (1973). "There are three approaches to determine whether an error is harmless beyond a reasonable doubt: (1) whether the error contributed to the conviction; (2) whether the other evidence presented overwhelmingly supports conviction; and (3) whether the evidence that was excluded was duplicative or cumulative." *People v. Tabb*, 374 Ill. App. 3d 680, 690 (2007). In this case, the other evidence does not overwhelmingly support a conviction. Although A.C. testified affirmatively that defendant committed the offenses charged, and it is well settled that "the positive testimony of a single credible witness is sufficient to sustain a conviction" (*People v. Robinson*, 3 Ill. App. 3d 858, 862 (1972)), defendant's conviction nonetheless depended entirely on A.C.'s credibility, and the evidence to which the trial court's error denied defendant access could have been used to challenge A.C's credibility. Nor would the evidence defendant sought by the subpoena have been duplicative or cumulative. Because defendant could not question A.C. about the inconsistency in his original civil complaints as to the absence of allegations of inappropriate touching by defendant when A.C. was a minor, the failure to identify witnesses who may have been able to testify that A.C. talked about his consensual sexual activity with defendant as an adult without mentioning defendant's alleged abuse when A.C. was a minor deprived defendant of additional evidence to support his defense that A.C. fabricated the abuse. *Cf.*, *People v. Cerda*, 2014 IL App (1st) 120484, ¶ 213 (finding

error in exclusion of evidence to support argument that outcry of sexual assault was a fabrication was harmless beyond a reasonable doubt where record was "full of testimony" to support that argument), see also *People v. Carroll*, 322 Ill. App. 3d 221, 224 (2001) (holding exclusion of evidence "crucial to the defendant's defense" entitled the defendant to a new trial even were evidence would have merely corroborated the defendant's testimony). "In determining whether an accused had been prejudiced by the rejection or exclusion of evidence, so as to require a reversal of the judgment, a reviewing court 'looks to the entire record to see if the rejected evidence could have reasonably affected the verdict, and will refuse to disturb the judgment where guilt is shown beyond a reasonable doubt or where, upon the evidence, a different result could not have been reached.' [Citation.]" *People v. Montes*, 263 Ill. App. 3d 680, 691 (1994). In this case, we find that additional evidence concerning A.C.'s conversations about his consensual sexual relationship with defendant could have reasonably affected the jury's verdict and a different outcome could have been reached. *Id*. Accordingly, we find the trial court's error prejudiced defendant and requires reversal. We note the State adduced sufficient evidence to sustain a conviction against defendant and therefore we remand for a new trial not inconsistent with this order. See *People v. Ward*, 2011 IL 108690, ¶ 50.

¶ 72    Defendant filed a motion in this court, after the denial of a similar motion in the trial court, to unseal Collins's report and supplement the record on appeal with the report. See Ill. S. Ct. R. 415(f) (eff. Oct. 1, 1971) ("If the court enters an order granting relief following a showing *in camera*, the entire record of such showing shall be sealed impounded, and preserved in the records of the court to be made available to the reviewing court in the event of an appeal."). We ordered that motion taken with the case. In light of our disposition of defendant's appeal, the motion is denied as moot.

¶ 73    Because we are remanding for a new trial we will briefly address issues that are likely to recur upon retrial.  See *People v. Jacobs*, 2016 IL App (1st) 133881, ¶ 88 ("We address defendant's arguments only to the extent that we find them likely to recur on retrial.").

¶ 74    First, we briefly address defendant's argument the trial court erroneously withheld the full psychological report and medical bills.  On appeal defendant argues that without access to the full psychological report and medical bills the defense "was not able to even try to rebut [A.C.'s] claim that he repressed his memory."  The State notes defendant never subpoenaed the psychological reports or bills and thus cannot complain about the scope of the disclosure the trial court provided.  Defendant's reply does not address the State's argument.  Our review of the record reveals that the psychological reports came into the trial court's hands through the court's order to A.C.'s attorney to identify any inconsistent statements A.C. made.  Defendant does not contend he subpoenaed those documents or that his request was denied.  Therefore, resolution of this question is not properly before this court; on remand, the defense may seek to obtain the disputed materials and the matter will be resolved by the trial court.  See *Smith v. Eli Lilly & Co.*, 173 Ill. App. 3d 1, 32 (1988), reversed on other grounds, 137 Ill. 2d 222 (1990), citing *Kimbrough v. Jewel Companies. Inc.*, 92 Ill. App. 3d 813, 819-20 (1981) ("there is in the record no motion by the plaintiff for discovery, or any motion to continue the motion for summary judgment until discovery could be had or any argument to the trial court that the plaintiff would in some way be prejudiced if such a continuance were not granted.  Accordingly such issue is not properly before this court.").

¶ 75    Next, defendant argues the trial court erred in prohibiting the defense from cross-examining A.C. about the contents of his civil complaints.  The State responds defendant's Confrontation Clause rights were satisfied by the trial court's allowance of cross-examination

into whether A.C. was suing defendant and Concordia for money and the material in the complaint defendant's attorney said he wanted inquire about did not impeach A.C.'s trial testimony. The State also argues any Confrontation Clause error was harmless beyond a reasonable doubt because the defense cross-examined A.C. about the existence of the lawsuit and whether he discussed it with the press. Defendant's attorney also cross-examined A.C. on whether A.C. mentioned any alleged childhood abuse during some of those press interviews. Thus, the State argues, additional questions about the specific contents of A.C. civil complaints and A.C.'s beliefs about defendant's character and sexual orientation would not have led the trial court to discredit A.C.'s testimony. "The scope of cross-examination lies within the sound discretion of the trial court and this court will not disturb the exercise of that discretion unless there has been an abuse of discretion." *Virzint v. Beranek*, 119 Ill. App. 3d 97, 101 (1983).

¶ 76     In his reply, defendant confirms that his theory at trial was that "the various inconsistencies within the four complaints filed during [A.C.'s] civil case were grounds for impeachment." The defense would have asked A.C. why he would make certain (positive) claims "about a person that he also claimed sexually abused him." As the State notes, however, defendant has pointed to no testimony in the record by A.C. making the claims about defendant he argues would be inconsistent with the allegations in the complaint. The trial court admonished defendant's attorney that he could ask A.C. whether A.C. ever said certain things about defendant but we have not been directed to anywhere defendant's attorney asked those questions.[2] Even had defendant's attorney asked those questions of A.C., there is no dispute the

---

[2]     "TRIAL COURT: So you have a right to ask him when did you first meet him? Did you ever tell anybody he was an honest person? Did you ever tell anybody he was a good guy? You have a right to ask him that, but as far as the complaints go, no."

complaint is not verified by him. "An unsigned complaint cannot be used to impeach a witness" even where the witness testifies as to the allegedly impeachable matter. *Mantia v. Kaminski*, 89 Ill. App. 3d 932, 937 (1980). In *Mantia*, the plaintiff sought to impeach testimony that the defendant was driving carefully with allegations of negligence in a complaint. *Id.* The complaint at issue had been filed on behalf of a minor by his mother. *Id.* The court found the witness had not signed the complaint and therefore the trial court properly refused to allow its use to impeach the witness. *Id.* Defendant does not dispute that A.C.'s complaints are not verified.

> "The court refused to allow impeachment with a prior complaint in *McDonnell v. City of Chicago*, 102 Ill. App. 3d 578, 582-83 (1981). In *McDonnell*, the court found that:
>
>> '\*\*\* unsigned complaints cannot be used for impeachment or as admissions against interest of a party thereto in another action based on the same incident. [Citation.] Without a verification there is no evidence that the party authorized or confirmed the truth of the allegations.'
>> [Citation.]
>
> In the instant case, the earlier complaint also was not verified." *Ryan v. Mobil Oil Corp.*, 157 Ill. App. 3d 1069, 1080-81 (1987).

Here, there is no evidence that A.C. "authorized or confirmed the truth of the allegations." *Id.* On appeal defendant argues that "[i]t would follow that a reasonable inquiry [by his attorney] into the truthfulness of the contents of the civil complaints would include inquiring into [A.C.'s] personal knowledge of the facts of the case." However, defendant has cited no express authority finding an exception to this rule based on an attorney's duty to make a reasonable inquiry to

ensure the complaint is well-grounded in fact. See Ill. S. Ct. R. 137 (eff. July 1, 2013). We find no error in the manner in which the trial court proceeded in this regard.

¶ 77     Next, defendant argues the trial court erroneously relied on a video it excluded from evidence to corroborate A.C.'s testimony. The State responds the trial court relied on properly admitted testimony about the video and not the video itself. In light of our holding reversing defendant's conviction and remanding for a new trial we have no need to resolve this dispute unless and until it repeats itself at retrial. However, we do note that defendant's argument that "the Judge's decision to *reference* [the video,] even if his decision could have been made with independent in-record evidence, was reversible error" (emphasis added) is meritless. Defendant does not dispute the admissibility of testimony or stills taken from the video. We think it not possible to consider such evidence without *reference* to its source.

¶ 78     Next, defendant argues the trial court erred in relying on expert testimony from a lay witness when it relied on A.C.'s testimony that he repressed his memory of defendant's alleged abuse. The State responds defendant cannot complain because his attorney elicited the alleged expert testimony on cross-examination. "A criminal defendant cannot complain on appeal of the introduction of evidence which he procures or invites." *People v. Williams*, 192 Ill. 2d 548, 571 (2000). The State further argues A.C. did not offer expert testimony of a specific medical diagnosis but "merely made two passing references to 'repressed memories' in response to defense counsel's questions" that were "cumulative of his testimony that he was temporarily unable to recall certain events and then remembered those events at a later date." "[A] lay witness's opinion cannot be based on scientific, technical, or other specialized knowledge within the scope of Illinois Rule of Evidence 702 (eff. Jan. 1, 2011), which prescribes the subject matter

of expert testimony ([citations]).” *People v. Beck*, 2019 IL App (1st) 161626, ¶ 20. Because this issue is likely to recur on retrial, we will address it.

¶ 79    A.C. may only testify about matters within his personal knowledge: his claim that he initially did not recall defendant's alleged abuse when A.C. was a minor but he began to remember it after engaging in therapy.

> “A lay witness may offer opinion testimony provided that it is helpful to a clear understanding of her testimony or a determination of a fact at issue. [Citations.]  The opinion testimony of a lay witness must also be rationally based on the witness's perception.  [Citation.]”  *Steele v. Provena Hospitals*, 2013 IL App (3d) 110374, ¶ 48.

A.C.'s references to “repressed memory” were improper.  On remand, A.C. may only offer testimony based on his personal knowledge but may not describe a specific medical diagnosis. See *id*. ¶ 47 (“A ‘description' of the rash would be, for example, it was flat or raised, pink or red, blistery or solid, clustered or isolated, hot or cool to the touch, etc.  Instead, each witness's attestation that it ‘looked like chicken pox' was, in essence, an assurance to the jurors that (1) she knew what chicken pox rash looked like, and (2) she was able to conclusively distinguish it, as indicative of chicken pox, as opposed to the myriad other rashes which can appear on the human body.”).

¶ 80    Finally, we have no need to address defendant's argument the State failed to prove him guilty beyond a reasonable doubt.  We find only that based on the evidence adduced at the first trial, “any rational trier of fact” could have found the offense proven beyond a reasonable doubt thus remand for a new trial is not prohibited.  *Ward*, 2011 IL 108690, ¶ 50.

¶ 81                                    CONCLUSION

¶ 82     For the foregoing reasons, the circuit court of Cook County is reversed, and the cause is

remanded for a new trial.

¶ 83     Reversed and remanded.