THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. QUINTON MONTES, Defendant-Appellant.

First District (5th Division)    No. 1—91—3179

Opinion filed May 20, 1994.

Daniel D. Yuhas and Jeffrey D. Foust, both of State Appellate Defender's Office, of Springfield, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb and Linda Woloshin, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE MURRAY delivered the opinion of the court:

Following a jury trial, Quinton Montes was convicted of second degree murder and sentenced to 12 years' imprisonment with the Illinois Department of Corrections. The defendant appeals his conviction.

Defendant presents two issues for review: (1) whether the trial court erred in failing to allow the defense to present evidence that the defendant had previously been the victim of a beating requiring hospital treatment; and (2) whether the trial court erred in refusing to allow the defendant to cross-examine the interrogating police officer regarding his background in the Spanish language and in refusing to allow the defendant to testify concerning the difficulties he had in understanding the interrogating officer.

The relevant facts are as follows.

Isabelle Rutledge testified that on October 1, 1989, she was the resident manager at the Belshire, a 140-unit apartment building located at 1062 West Bryn Mawr in Chicago. Leon Ortiz (Ortiz) was employed as a night manager from 10 p.m. to 6 a.m. Ortiz had been employed at this building for at least one year and his duties included collecting rent and making the rounds of the hallways two or three times a night. Ms. Rutledge had never seen Leon Ortiz carry a weapon while he was working.

In order to gain entry into the apartment building without a key, a person would ring a doorbell and that tenant would have to come down and meet the guest at the door. Luiz Montes lived in apartment 308. Ms. Rutledge recognized the defendant as someone who had come into the apartment building on other occasions prior to October 1, 1989. She had no idea whom he was visiting.

Officer Frederick Snyder testified that on October 1, 1989, at 2:35 a.m. he and Officer Karen Munn went to 1062 Bryn Mawr. As they passed through the foyer of the building into the lobby, they found a large area of blood throughout the lobby. Behind the counter they found an individual on the floor who had been stabbed multiple times. A knife was found on the floor next to the entrance of the office. A watch was found on the other side in the corner where the largest concentration of blood was located.

Detective Ronald Yawger testified that on October 1, 1989, he and Officer Joe Kazolek had been assigned to investigate the stabbing of Leon Ortiz. When they arrived at the scene there were large amounts of blood throughout the lobby area of the hotel. A brown-handled pocket knife and a watch were recovered from the scene. Blood was splattered all over and there were tennis shoe prints in the blood that were not the same as the victim's shoe prints.

The victim was deceased when the officers first saw him. He was in a sitting position leaning against a wall and a metal desk. Ortiz had 14 stab wounds on his body. There was a large amount of blood everywhere, including all over the victim's body.

There was a trail of blood droplets leading out of the vestibule, out of the office area, out of the lobby, through the vestibule and out onto the sidewalk. The officers followed the droplets of blood which then led east on the sidewalk up to the alley. The trail continued northbound down the alley ending at the rear floor of a building at 5634 North Kenmore. The door was locked and the handle was bloody. The officers went around to the front of the building where they gained entry. They went down into the hallway and could see droplets of blood. The droplets of blood ended at apartment 3 in the basement area.

Officer Yawger later learned this was Montes' apartment. Upon entering the Montes apartment, he saw blood splatters on the kitchen wall. Mrs. Montes was present, Mr. Montes was not. When the officers left the building, they once again followed the blood splatters. The trail of blood continued out the front of the building, across the street, across Kenmore to 1025 Hollywood (a five-story apartment building with over 100 apartments). For each apartment in that building there is a doorbell. The button with number 11 on it was the only button that had blood on it. That buzzer went to apartment 209, the residence of Heriberto Rebollar and Justo Diaz. The officers went to apartment 209. Once again there was blood on the door handle. Mr. Rebollar answered the door. The officers looked in the apartment for Montes. Montes was not present. However, the police did recover a short-sleeved gray shirt with blood on it.

Thereafter, the police returned to the Montes' apartment. Officer Guerrero was also present at this time. Mr. Montes was sitting in the kitchen. Montes was placed under arrest at this time. Montes had two cuts on his hand, one a very severe cut on his right index finger. He also had a little bruising around his neck.

Floyd Stevenson testified that on October 1, 1989, he was employed at the 1025 Hollywood building as a uniformed security officer. He began working at midnight that evening. Around 1 a.m. he began making his rounds of the parking lot. At approximately 2:30 a.m. he was standing in the entrance on the Kenmore side of the parking lot watching the area. At that time he saw a young man running down the street holding his hands together "real tight." The man ran around to the front of the 1025 Hollywood building. Mr. Stevenson identified Montes as the man he saw that evening.

Robert Lock testified that on October 1, 1989, at approximately 2:30 a.m. he was going to his home at 5634 North Kenmore. After he walked in his front door he noticed one of the tenants, Quinton Montes, standing in the doorway of his apartment. Montes was talking to a woman, and "he kind of ushered her into his apartment and shut the door." A few moments later Montes walked past him again. He kind of scurried past him going towards the alley out the back of the building. Montes was walking kind of bent over with his right hand close to his stomach and a bag under his arm.

Heriberto Rebollar testified that he had known the defendant for three years and considered him a friend. At approximately 2:30 a.m., October 1, 1989, Montes arrived at his home at 1025 Hollywood. Montes said he had a problem and was going to change. Montes' clothes were bloodied, and he changed and put them in a plastic bag. Although Montes asked to stay, Rebollar told him he didn't want any problems. Thereafter, the defendant left.

Rebollar testified that Montes did not leave any clothing behind, nor did Montes make any phone calls from the apartment. Montes lived one half block from Rebollar's apartment. Rebollar did not know why Montes wanted to spend the night. On cross-examination, Rebollar testified that if Montes had wanted to use his telephone he would not have allowed him to do so.

Chicago police officer Richard Guerrero testified that on October 1, 1989, he was assisting Detectives Ronnie Yawger and Joe Kazolic in a homicide investigation. In the course of the investigation he was at 1062 West Bryn Mawr. He spoke with several individuals at that building and then decided to try the offender's residence again. He went to an address on Kenmore where he spoke to a woman (he believed to be the defendant's wife) in Spanish. The officers stepped inside the apartment and saw the offender preparing himself breakfast. Montes' hand was bandaged and appeared to have dry blood on it. Officer Guerrero identified himself and placed Montes under arrest. He took Montes to the police station and placed him in the first interview room, where he had a conversation with Montes. Detective Kazolic was also present. Montes was advised of his rights and he made a statement. Officer Guerrero testified that to the best of his recollection Montes gave the following statement. Montes stated he had gone to an apartment at 1062 West Hollywood, where he tried to get in but the vestibule was locked. An unidentified male had a key and opened the door and the defendant followed him inside. As he entered, Montes was approached by a manager he knew and was told he was not allowed inside due to past problems. (On cross-examination Officer Guerrero testified that "past problems" might not have been his specific words.) Montes told the manager he wanted to visit a man on the sixth floor who lived with his aunt. The manager told Montes to ring for her and have her come down to see him. Montes then explained that his aunt recently had foot surgery and was unable to come downstairs. The manager told Montes to leave and the two men began to argue.

Montes stated that while they were arguing, the manager shoved Montes. This infuriated Montes because he is Mexican and has a violent temper. Montes pulled out a brown folding knife and stabbed the manager three or four times. When asked about the cuts on his hands, Montes stated that the cuts occurred when the knife folded across his hands, when the victim, trying to defend himself, tried to take the knife away from Montes. The unarmed manager was eventually able to take the knife from Montes. Montes then ran out the front door. He turned around and saw the manager standing by the desk.

Montes ran through an alley and entered his apartment through the rear entrance. He grabbed a clean shirt and a pair of pants, put them in a bag and ran over to a friend's house. When he arrived at his friend's house, he told his friends what had happened. He left within five minutes after changing his clothes because his friends did not have any beer. Montes then went to a tavern and drank until 5 a.m. Thereafter, he returned home.

Montes told Guerrero that the police could find his clothing at home, where the police later did retrieve the clothing. Officer Guerrero testified that Montes told him he carried the knife for protection because there were a lot of blacks in his neighborhood.

On cross-examination Officer Guerrero testified to the following. Officer Guerrero spoke with Montes and his wife in Spanish. He did not recall Montes telling him that the reason he carried a knife was because he had been attacked by blacks a couple of years earlier. The detective made extensive mental notes of what he was told by Montes, but did not make contemporaneous written notes. Neither of Officer Guerrero's partners, Officer Kazolic and Yawger, understand Spanish. His partner was taking handwritten notes. However, his partner could not write down what Montes was saying as he did not understand Spanish.

Officer Guerrero testified that he could read Spanish but could not write Spanish very well. The first interview with Montes lasted between 20 and 30 minutes and the second interview lasted 30 minutes. During the first interview the police officers and the defendant were present. During the second interview, Montes, Detective Kazolic and an assistant State's Attorney were present. Officer Guerrero would repeat in English what Mr. Montes said in Spanish. The other officers took notes of the English interpretation. Officer Guerrero also served as an interpreter for the assistant State's Attorney. At the time Montes gave his statement, Montes was responding to questions rather than giving a continuous rendition of the events. At no time did the defendant refuse to answer any questions.

Officer Guerrero did not personally conduct an investigation to determine whether it was true that Montes' aunt lived in the apartment building. He was not aware if any of the other officers investigated the same.

Dr. Robert Kirschner, a deputy Cook County medical examiner, testified Leon Ortiz had been 29 years old, 5 feet 8 inches tall, and 162 pounds. He then proceeded to describe the multiple stab wounds to the neck (1), shoulder (1), chest (2), abdomen (2), arms (6), hand (1) and left thigh (1). The wounds of the left and right forearms were consistent with defensive-type wounds. Ortiz's death was caused by multiple stab wounds.

Based on the presence of the defense wounds, Dr. Kirschner believed the victim was moving at the time the injuries occurred. The term "defense wound" is a term used by doctors and is consistent with an individual in a defensive posture defending, holding his arms, hands up in a way to defend against a weapon. However, the term does not indicate whether or not the victim was the aggressor. Dr. Kirschner had no opinion as to who was the aggressor in this case. He could not tell from the wounds whether Leon Ortiz was going forward or backwards. Apart from the scratch wounds to the palm, shoulder and abdomen, all the other wounds were deep penetrating wounds which would have required medical attention. No single wound caused Ortiz's death; however, the 14 wounds together would have caused his death.

The parties stipulated that the blood on the brown knife and the watch was the same type as the blood of Leon Ortiz. The watch and the knife were negative for fingerprints. The State rested.

Hermalinda Montes, Montes' wife of nine years, testified that both she and Quinton were born in Mexico and had lived in Chicago for nine years. Mr. Montes was employed as a dishwasher.

Defense counsel asked Hermalinda if she noticed a change in her husband during the period of 1985 to the fall of 1989. The State objected and the trial court sustained the objection. At a sidebar, defense counsel indicated the defense was trying to introduce some evidence in relation to a previous incident that happened to Montes. Defense counsel indicated Montes was injured in a prior street attack and as a result put in the hospital. Defense counsel argued this information could go to defendant's state of mind and the reasons for Montes' conduct of "carrying a knife as he did from that point on, out of fear of the street attack." The incident occurred four years prior to the incident at issue. Although the trial court prohibited admission of this evidence, the trial court indicated that it would not permit the State to argue that Montes went over to the building with the purpose of killing Ortiz.

Hermalinda testified that on the evening of September 30, 1989, she was home with her family. Her husband was not at home the entire evening. At approximately 1 a.m. on October 1, 1989, her husband arrived at home injured, his hand cut with his shirt all wrapped around it. Montes told her he was hurt; he had had a fight. Montes left the apartment again. Thereafter, the police arrived and asked Hermalinda where her husband was. The police asked her in English and she did not understand. The police then took her to the police department. At the police station Hermalinda spoke Spanish to Officer Guerrero. The State's objections as to questions regarding

whether Hermalinda had difficulty understanding Officer Guerrero were sustained.

During cross-examination, Hermalinda identified the shirt and pants Montes was wearing when he left the apartment the night of the incident. Hermalinda stated that her husband owned a knife, but did not recognize the knife that had been admitted into evidence. Mrs. Montes had never seen her husband with the knife the State had in evidence. When the defendant left the apartment before the incident, he took a black-handled knife with him.

Montes testified on his own behalf. Montes did not intend to kill Ortiz. He last saw Ortiz on October 1, 1989, at 1062 West Bryn Mawr. When Montes left the building, Ortiz was standing and holding a knife. Montes identified the knife in evidence as the knife Ortiz was holding at that time. Ortiz told Montes "[t]o wait for him or he'd kill [Montes]." Montes was born in Mexico and can neither read nor write. He moved from Mexico to Chicago in 1983. His uncle, Luiz Montes, and his aunt, Ortinia Seuna, also live in Chicago.

On October 1, 1989, he ate dinner with his family and at around 10:30 p.m. went to a bar for a beer. At approximately 2 a.m., he went to 1062 West Bryn Mawr to visit his aunt. He had been to visit her at that location between 50 and 100 times before. The door was open and Montes entered the building. There was a man there who told him he could not go in. Montes now knows that this man was Ortiz. As Montes entered, Ortiz asked Montes where he was going. Montes told Ortiz he was going to visit his aunt. Ortiz told Montes he could not enter.

Ortiz then pushed Montes three or four times and called him "Badaho" (interpreted as "asshole"). Ortiz grabbed Montes in the throat with his right hand, choking him, and pushed Montes backwards. Montes could not breathe. He took out his knife from his pants pocket. Montes identified the State's exhibit as the knife that he had been carrying that evening. Ortiz was very angry and Montes thought Ortiz was going to kill him. Montes started to push Ortiz with the knife. He did not push him with the intent to kill him; rather, he was trying to have Ortiz let go of him because he was choking him. Ortiz was on top of him and "was really letting [Montes] have it." Ortiz then took the knife from him and cut Montes' fingers.

Montes did not recall how many times he stabbed Ortiz before Ortiz took the knife from him. After Ortiz cut him, Montes ran out. Montes ran because Ortiz had taken his knife away from him and was going after him. Ortiz "said to wait for him and that he was going to kill me [Montes]."

Montes then went to his apartment and put a rag around his hand. Montes left and went to Heriberto Rebollar's home because he was afraid if he stayed at home Ortiz would come there and kill him. He did not stay at Rebollar's house. He went to a bar for approximately two hours and had two beers. When he left the bar he returned to his apartment. His wife was not home at this time.

Montes purchased the knife in 1985 when something happened to him. The State's objection to the defendant's question about what happened in 1985 was sustained.

Montes spoke in Spanish to Officer Guerrero and told him several times what had occurred. When Montes stated that he had to repeat his story several times because Officer Guerrero did not understand Spanish very well, the State's objection to the testimony was sustained. The State's objections as to Montes' having had difficulty understanding some of the words Officer Guerrero was using were sustained. Defense counsel argued that the testimony was relevant because it went to the circumstances surrounding this statement. Counsel wanted the jury to know that Montes had to repeat himself several times so Montes and Officer Guerrero could communicate. Outside the presence of the jury, the court noted that Montes seemed to have difficulty in understanding the court interpreter.

Montes testified he never told Officer Guerrero that he was infuriated. He never told Officer Guerrero that he was Mexican and had a violent temper. Montes did tell Officer Guerrero that Ortiz was real violent and had said he was going to kill the defendant. More than once Montes told Officer Guerrero that he was very afraid. At no time after he left the 1062 Bryn Mawr building did Montes call the police. When Montes was asked why he did not call the police, the trial court sustained the State's objection that the testimony was self-serving.

During cross-examination, Montes identified the clothes that he was wearing at the time of the incident. Montes testified that he had visited his aunt on previous occasions at 2:30 a.m. Montes did not recall where he first stabbed at Ortiz, nor how many times he stabbed Ortiz. He stabbed Ortiz in the hand, but does not recall which one. He remembered stabbing him in the arm but didn't remember what part of the arm. He remembered stabbing him in the stomach but did not know how many times.

Montes saw his landlord, Bob Lock, in his building, but he did not say anything to him because Mr. Lock speaks English and he wouldn't have understood what Montes had to say to him in Spanish. After Montes left his apartment he ran into a uniformed security guard (Floyd Stevenson). He did not speak to the security guard

because he did not speak Spanish. Montes assumed this because the security guard was black. The last time Montes saw Ortiz was at the 1062 Bryn Mawr building. Montes left the bar when it closed at 5 a.m. When he got home he fixed himself some eggs. At that time the police arrived at his apartment. Up to this time he did not seek any kind of medical attention for his hand.

When the police arrested Montes, Officer Guerrero was speaking to him in Spanish. Montes testified that he told Officer Guerrero that he carried a knife because he was afraid of blacks in the neighborhood.

The defense rested.

Officer Guerrero testified in rebuttal that Montes never told him that Ortiz had choked him about the neck. On cross-examination Officer Guerrero testified that he was born in Chicago and he was aware that Montes was born in Mexico.

The jury convicted Montes of second degree murder. Defendant was sentenced to 12 years' imprisonment with the Illinois Department of Corrections.

For the following reasons, we reverse the decision of the trial court and remand for a new trial.

I

The defendant argues that the trial court committed reversible error in failing to allow the defense to present evidence from the defendant and his wife that the defendant had previously been the victim of a beating requiring hospital treatment. The State maintains the trial court was correct in rejecting the offered evidence where it was too remote and where the defendant offered sufficient evidence of his state of mind at trial. In addition, the State argues, assuming *arguendo*, that if any errors occurred in the present case, the errors were harmless.

Four years prior to the Ortiz stabbing, Montes was attacked and beaten on the street and taken to the emergency room. Subsequently, he and his wife attempted to contact the police regarding the street attack and the police either refused to discuss the complaint or disregarded them. The trial court did not permit this testimony. The trial court did not allow Montes to introduce evidence regarding why he did not call the police, agreeing with the State that such testimony would be self-serving. Upon defense counsel's objection about the State eliciting evidence on the defendant's failure to call the police, the court sustained the objection to calling the police on the telephone. However, in rebuttal argument, the prosecutor argued: "Does an innocent man not at least call an ambulance or the police to come?" When defendant objected, the trial court responded:

"The court will indicate the arguments are based on the evidence. If it's not, the jury should disregard it. The State has the burden of proof. Counsel may continue to make arguments based on the evidence."

Defendant argues he was not going to testify to the truth of any out-of-court statements, but rather he was going to testify concerning whether or not he telephoned the police, and then would have explained why he failed to do so.

In Illinois, a person is justified in using force likely to cause death or great bodily harm "only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another." (Ill. Rev. Stat. 1991, ch. 38, par. 7—1.) The affirmative defense of self-defense is raised only if defense presents some evidence that (1) force had been threatened against him; (2) defendant was not the aggressor; (3) danger of harm was imminent; (4) the force threatened was unlawful; (5) defendant actually believed the danger existed and the kind and amount of force was necessary to avert the danger; and (6) defendant's belief was reasonable. (*People v. Willis* (1991), 217 Ill. App. 3d 909, 917, 577 N.E.2d 1215, 1220.) The existence of self-defense is a question of fact. *Willis*, 217 Ill. App. 3d at 918, 577 N.E.2d at 1220.

A defendant's reasonable belief that such force was necessary is an essential element of his self-defense claim, and thus, a defendant's state of mind at the time of the occurrence is a material issue and a proper subject of cross-examination. (*People v. Kline* (1980), 90 Ill. App. 3d 1008, 1014, 414 N.E.2d 141.) Where a defendant claims that he acted in self-defense, he may be allowed to testify to out-of-court statements which are probative of his state of mind at the time of the occurrence; such testimony is generally excepted from the rule against hearsay. *People v. Ortiz* (1978), 65 Ill. App. 3d 525, 533, 382 N.E.2d 303.

"Where *** the witness is the defendant and his claim is self-defense, his opinion as to his state of mind surrounding the occurrence is an essential part of his claim." (*People v. Kline* (1980), 90 Ill. App. 3d 1008, 1014, 414 N.E.2d 141, citing *People v. Allen* (1941), 378 Ill. 164, 37 N.E.2d 854.) The determinative issue where deadly force is used is whether the defendant's belief that it was necessary to use deadly force was reasonable under the circumstances. (*People v. Collins* (1989), 187 Ill. App. 3d 531, 534, 543 N.E.2d 572, 574.) "[S]elf-defense necessarily involves the question of whether defendant *subjectively* believed at the time of the incident, that the force exercised against the victim was necessary." (Emphasis in original.) *People v. Eshaya* (1986), 144 Ill. App. 3d 757, 765, 494 N.E.2d 772, 778.

"Where a claim of self-defense rests upon some reasonable basis, exclusion of state-of-mind testimony by a defendant will ordinarily constitute reversible error unless sufficient evidence of his intent is admitted at a subsequent stage of the trial." (*People v. Keefe* (1991), 209 Ill. App. 3d 744, 751-52, 567 N.E.2d 1052, 1056-57.) The only evidence of Montes' state of mind was his own testimony. This testimony was contradicted by Officer Guerrero, the interrogating officer who conversed with the defendant in Spanish and whom the defense was not permitted to cross-examine regarding his proficiency in Spanish.

█ In determining whether an accused had been prejudiced by the rejection or exclusion of evidence, so as to require a reversal of the judgment, a reviewing court "look[s] to the entire record to see if the rejected evidence could have reasonably affected the verdict, and will refuse to disturb the judgment where guilt is shown beyond a reasonable doubt or where, upon the evidence, a different result could not have been reached." (*People v. Hoddenbach* (1983), 116 Ill. App. 3d 57, 60, 452 N.E.2d 32.) The incident to which Montes and his wife would have testified may have explained the reason Montes was carrying a knife that fateful evening and Montes' previous experience in calling the police may have explained why, on the night in question, he did not call the police. If this were not a close case, we would agree with the State that the error was harmless. However, we believe that this was a close case insofar as the degree of murder Montes committed, or the possible existence of a legitimate claim of self-defense. In addition, we find the rejection of the evidence was complicated by the prosecutor's statement during closing argument: "Does not an innocent man at least call an ambulance or the police to come?" In light of the prosecutor's comment, we believe the exclusion of the testimony to be error. Moreover, for the reasons set forth below, we believe that defendant was improperly denied the opportunity to cross-examine the interrogating officer as to his ability to communicate with the defendant. We find that defendant was prejudiced by the cumulative restrictions placed by the trial court on his presentation of his defense.

## II

In his second assignment of error, the defendant contends the trial court abused its discretion in refusing to allow the defendant to cross-examine the interrogating officer (Officer Guerrero) regarding his background in the Spanish language and in refusing to allow the defendant to testify concerning the difficulties he had in understanding the interrogating officer. The State maintains the trial court did not abuse its discretion in that the jury was made aware of adequate

factors to determine whether the interrogating officer was worthy of belief and the fact that defendant had to repeat his story a few times to Officer Guerrero was irrelevant. In addition, the State argues if the trial court erred, any error was harmless.

The primary evidence against defendant was his purported statement in Spanish to Officer Guerrero. The defendant does not contend the State did not present an adequate foundation for Officer Guerrero to testify as to his interpretation of the defendant's statements. However, the defendant does contend the defense should have been allowed to thoroughly cross-examine Officer Guerrero in front of the jury concerning the reliability of his interpretation, and similarly, Montes should not have been prevented from testifying about his difficulty in communicating with Officer Guerrero.

When defense counsel asked Officer Guerrero if he could determine by speaking with Montes that he spoke in Spanish the way those from Mexico speak Spanish, the State's objection was sustained. When defense counsel asked Officer Guerrero whether he ever read the police report back to Montes in Spanish to verify if what he had translated for the defendant was accurately translated into English, the State's objection was sustained. Montes was prohibited from testifying about his difficulties in understanding Officer Guerrero. Although Montes testified that he had to repeat his story several times because Officer Guerrero did not understand Spanish very well, the State's objection to said testimony was sustained. In addition, when defense counsel asked Montes if he had any difficulty understanding any words Officer Guerrero used, the State's objection was sustained. Outside the presence of the jury, defense counsel argued the above testimony was relevant in that it went to the circumstances surrounding the statement. The trial court indicated that if Montes did not understand, how did he know what he did not know. Defense counsel argued that Montes was aware due to the fact that he had to have Officer Guerrero repeat himself because the two could not communicate.

Officer Guerrero testified that he made extensive mental notes. He did not, however, make any contemporaneous written notes. Officer Guerrero's partners wrote down a statement from Officer Guerrero's English interpretation of defendant's oral Spanish statements.

The State argues that the fact that defendant might have had to repeat his story a few times is not important, but rather what is important is whether the defendant made the statements and whether Officer Guerrero understood them. The State points out that the defendant and Officer Guerrero had two lengthy conversations in Spanish, wherein Officer Guerrero asked defendant questions and de-

fendant answered the questions and maintains this establishes Officer Guerrero and the defendant were able to understand each other, even if defendant might have had to repeat himself on a few occasions. We agree with the State that it is important whether Officer Guerrero understood the statements defendant made; however, we disagree with the contention that the fact that defendant might have had to repeat his story a few times is not important.

Generally, the scope of cross-examination lies within the sole discretion of the trial court, and its decision will not be disturbed unless an abuse of discretion has resulted in manifest prejudice to the accused. (*People v. Diaz* (1988), 169 Ill. App. 3d 66, 522 N.E.2d 1386.) In this case we believe the trial court abused its discretion in prohibiting Montes from testifying as to his difficulty in understanding Officer Guerrero.

Montes does not deny making a statement to Officer Guerrero. Yet, Montes' testimony and Officer Guerrero's testimony differ as to the content of this statement. If Officer Guerrero's testimony is believed, Montes was guilty of murder. If Montes' testimony is believed, Montes committed the stabbing in self-defense. Although the trial judge held an *in camera* hearing to determine Officer's Guerrero's ability to speak and understand Spanish and Officer Guerrero testified that he understood and spoke Spanish better than he could write Spanish, there is no evidence as to the dialect of Spanish he spoke. Spanish words, like English words or for that matter those of any other language, can have different meanings depending on the region one is from or the specific dialect one speaks. Moreover, Officer Guerrero's ability to speak Spanish is a separate issue from the defendant's ability to comprehend him.

There was no issue as to whether or not Montes stabbed Ortiz. However, there was a question as to whether this act constituted murder as the State contended, self-defense as the defendant contended or something in between. We cannot say that the omission of defendant's testimony as to whether Officer Guerrero accurately interpreted his statement had no affect on defendant's theory of self-defense, nor can we say the error was harmless in this case. We find that the jury was entitled to hear Montes' testimony that he had difficulty communicating with Officer Guerrero. The weight to be given that testimony would be a determination to be made by the jury.

Accordingly, for all the reasons set forth above, we reverse the decision of the trial court and remand the matter for a new trial.

Reversed and remanded.

GORDON and McNULTY, JJ., concur.