**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2020 IL App (3d) 180189-U

Order filed August 4, 2020

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2020

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF | ) | Appeal from the Circuit Court |
| | ) | of the 21st Judicial Circuit, |
| ILLINOIS, | ) | Kankakee County, Illinois. |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | Appeal No. 3-18-0189 |
| v. | ) | Circuit No. 16-CF-439 |
| | ) | |
| | ) | |
| ROBERT D. WILLIAMS, | ) | The Honorable |
| | ) | Kathy S. Bradshaw-Elliott, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE CARTER delivered the judgment of the court.
Justices O'Brien and Wright concurred in the judgment
Justice Wright also specially concurred.

**ORDER**

¶ 1     *Held*:   In an appeal in a criminal case, the appellate court found that: (1) defendant was not proven guilty beyond a reasonable doubt of aggravated battery with a firearm because the State failed to negate defendant's claim of self-defense; and (2) defendant's conviction for aggravated unlawful use of a weapon, which was based, in part, upon defendant's failure to have an Illinois firearm owner's identification card at the time of the offense, could not stand because defendant had a valid gun permit from Indiana, his state of residence, when the offense

occurred.  The appellate court, therefore, reversed defendant's convictions for aggravated battery with a firearm and aggravated unlawful use of a weapon.

¶ 2       After a bench trial, defendant, Robert D. Williams, was found guilty of aggravated battery with a firearm (ABWF) (720 ILCS 5/12-3.05(e)(1) (West 2016)) and aggravated unlawful use of a weapon (AUUW) (720 ILCS 5/24-1.6(a)(1)(3)(C) (West 2016)) and was sentenced to consecutive terms in prison of eight years for ABWF and one year for AUUW. Defendant appeals his convictions, arguing that: (1) he was not proven guilty beyond a reasonable doubt of ABWF because the State failed to negate defendant's claim of self-defense; and (2) his conviction for AUUW, which was based, in part, upon defendant's failure to have an Illinois firearm owner's identification (FOID) card at the time of the offense, cannot stand because defendant had a valid gun permit from Indiana, his state of residence, when the offense occurred.  We agree with defendant's arguments.  We, therefore, reverse defendant's convictions for ABWF and AUUW.

¶ 3                                    I. BACKGROUND

¶ 4       On September 24, 2016, shortly before 6 a.m., defendant shot Jermain Mason several times in Victoria Kennedy's apartment in Manteno, Illinois.  Mason was severely injured in the shooting but recovered.  Defendant was later charged with attempted murder, ABWF, and AUUW as a result of the shooting.  Defendant claimed that he had shot Mason in self-defense.

¶ 5       Defendant's case proceeded to a bench trial in November and December 2017.  The evidence presented at the trial established the following facts, most of which were uncontested. At the time of the shooting, Victoria Kennedy and Jermain Mason were in a relationship and lived together in Kennedy's apartment.  Mason and Kennedy had been living together for a short period, had a rocky relationship, and argued verbally almost every day.

2

¶ 6    Kennedy's apartment was a very small efficiency or one-bedroom apartment that was located, along with some other apartments, in the upstairs of a building above some businesses. Mason and Kennedy parked their cars in a parking area behind the building. An external stairway in the back of the building led up to a balcony, and, on the balcony, there was a door to Kennedy's apartment. Because the apartment was very small, the balcony door opened directly into Kennedy's kitchen. The kitchen had appliances on one side and cabinets on the other and had a narrow walkway between them that was about four or five feet wide. The walkway led to the entrance area of a small bedroom on the right side. The distance from the balcony door to the entrance area of the bedroom was approximately 8 to 15 feet. The bedroom did not have a door, and a curtain or sheet had been hung in the entrance area to separate the bedroom from the kitchen.

¶ 7    On the night before the shooting, Kennedy and Mason got into an argument. Mason left the apartment to spend the night at his mother's house in Kankakee. Kennedy contacted defendant, who she had recently met on a dating website. The two had been communicating for a few weeks to a month and had sent nude photographs to each other. Defendant thought that Kennedy was single. At about 1 a.m., Kennedy invited defendant to her apartment.

¶ 8    Defendant had never met Kennedy in-person and had never been to Kennedy's apartment. He arrived at the apartment at about 4:30 a.m. He parked his vehicle in the back of the building next to Kennedy's car, as Kennedy had directed, and went upstairs to Kennedy's apartment. All of the lights inside the apartment were off, and the apartment was very dark inside. Kennedy led defendant to the bedroom, and, shortly thereafter, they started having sex. As they were doing so, they were interrupted by a loud knock at the back door. It was Mason. Mason had stopped at the apartment on his way to work that morning to try to patch things up

3

with Kennedy and was angry because he saw a strange vehicle parked next to Kennedy's car and thought that Kennedy had another man in the apartment.

¶ 9    Defendant and Kennedy jumped out of bed.  Kennedy told defendant that the person knocking at the door was probably her ex-boyfriend and assured defendant that Mason did not have a key.  Kennedy threw some clothes on, rushed to the front door, and told Mason that she had company.  Kennedy did not turn any of the lights on, and the apartment was still very dark.  Defendant, who was still naked with a condom on, scrambled to find his clothes or the light switch, to no avail.  Unbeknownst to Kennedy, Mason had a key to the apartment.  He immediately opened the balcony door and went into the kitchen where he was met by Kennedy.  Defendant grabbed a semiautomatic pistol that he had brought with him into the apartment concealed upon his person.

¶ 10    Mason yelled at Kennedy and possibly used some profanity.  He pushed Kennedy out of the way and headed toward the bedroom.  As Mason got near or possibly into the bedroom, he was slightly backlit by a small amount of light coming from the balcony area, and defendant could see that Mason was a big guy and that he had something dark in his hand.  Defendant fired several shots at Mason.  The first shot hit Mason in the stomach.  Mason backed away from the bedroom entrance but remained in the pathway of the kitchen and continued to face defendant.  Defendant moved forward, trying to make his way to the only exit he knew about (the balcony door), and continued to fire the gun at Mason.  Kennedy was screaming.  The shots hit Mason in the chest, arm, and hip.  After being hit in the hip, Mason fell down onto his back on or near the balcony.  A final shot hit Mason in the leg after he was down.  Although defendant had more bullets left in the clip of his gun, he stopped firing, grabbed some of his clothes, and fled the

4

apartment. He was still naked at the time. As defendant was leaving, he told Mason that he was sorry.

¶ 11          Defendant left the area and drove to Chicago where some of his family lived. On the way, he stopped in Indiana and threw the gun off a bridge. At the time of the shooting, defendant was an Indiana resident and held a valid gun permit, a concealed carry permit, from Indiana. Defendant did not have an Illinois gun permit or an Illinois FOID card. The gun defendant had brought to Kennedy's apartment was a 9-millimeter Glock pistol. The pistol was a semiautomatic, which meant that the trigger had to be pressed for every shot that was fired. When defendant arrived at the apartment, he had 16 bullets in the clip of the gun and one bullet in the chamber of the gun. Defendant owned the gun legally and had never fired that gun or any other gun prior to the date in question. Approximately 9 shots were fired during the incident. Five of those shots hit Mason. The entire incident happened very fast. After the shooting occurred, a police officer who processed the scene recovered four spent shell casings from the bedroom floor of the apartment and five spent shell casings from the kitchen floor. According to that police officer, however, the location of the casings did not necessarily indicate from where in the apartment the shots had been fired.

¶ 12          At the time of the shooting, Mason was approximately 27 years old, 6 foot 4 inches tall, and weighed 287 pounds. Defendant was approximately 28 years old, 5 foot 11 inches tall, and weighed 195 or 200 pounds. The item that Mason had in his hand just prior to being shot was a gray flip cellphone that Mason used for work. After the shooting occurred, the police officer who processed the scene recovered that cellphone from the kitchen floor of the apartment where it had apparently been dropped by Mason after he was shot. Mason was unarmed at the time of the shooting and did not have a gun or any other weapon on his person that day.

5

¶ 13       As indicated above, the only real issue at defendant's bench trial was whether defendant had acted in self-defense. As to that issue, all three of the individuals (Mason, Kennedy, and defendant) involved in the incident at Kennedy's apartment agreed that Kennedy's apartment was very small, that no lights were on in the apartment at the time of the shooting, and that the inside of the apartment was very dark that morning. Mason, Kennedy, and defendant also all agreed that Mason did not make any verbal threats to defendant or even say anything to defendant before Mason was shot. Mason was, however, angry and yelling and had pushed Kennedy out of the way, although defendant did not see Mason do so.

¶ 14       With regard to how close Mason had gotten to defendant before the first shot was fired and certain other pertinent matters, Mason testified that he had just gotten to the entrance of the bedroom (but not inside the bedroom) and had started to move the curtain aside when he saw the "flame" from defendant's gun and felt something hit him in the stomach. Kennedy also testified that Mason had only gotten to the entrance of the bedroom.

¶ 15       Defendant, on the other hand, testified that after Mason was "banging" on the rear balcony door "aggressively" and defendant and Kennedy had jumped out of bed, Kennedy stated, "Oh, s***, he's going to kill me." Defendant asked Kennedy who was at the door, and Kennedy told him it was her "ex." Defendant asked Kennedy if Mason had a key, and Kennedy said, "Hold on." Defendant yelled to Kennedy to turn the light on, but Kennedy ran out of the bedroom and toward the rear balcony door. Defendant was still in the bedroom and was still naked with a condom on and could not see. He scrambled around trying to find a light switch and his clothing. Scared and unable to find a light, defendant reached under the front of the bed and grabbed his gun. Defendant was afraid that he was going to get hurt and that he was not "going to make it out." As Kennedy confronted Mason in the kitchen, defendant peeked out of

6

the bedroom and could see from the small amount of backlight that was coming from the balcony area that Mason was a big guy. According to defendant, Mason ran into the bedroom a few steps and was within "[b]reathing space" of defendant before defendant fired the first shot. As Mason was running into the bedroom, defendant saw a dark object in Mason's right hand and saw that Mason was reaching out toward defendant with his left hand. As he did so, Mason said, "[m]otherfucker." Defendant was scared for his life and thought that Mason had a weapon. Defendant reacted and started to fire.

¶ 16    As for what happened after the first shot was fired, Mason testified that he started backing up and said to defendant, "Hold on bro. What you—what you want?" Mason testified further that he tried to run out of the apartment through the door to the balcony, although he continued to face defendant the entire time. According to Mason, the final shot hit him when he was already down and lying on his back on the balcony. As defendant fired the shots, defendant said to Kennedy, "You set me up." Mason testified further that when Kennedy confronted the defendant immediately after or during the shooting, defendant pointed the gun at or toward Kennedy and told her to move or that he would shoot her too.

¶ 17    Kennedy testified that after defendant started shooting, Mason ran toward the rear balcony door. Defendant moved into the kitchen and continued to fire. Kennedy was in the kitchen at the time and some of the shots went past her. Kennedy told defendant to stop and asked defendant what the "f***" he was doing. Defendant accused Kennedy of setting him up and told Kennedy to move out of the way or that he would shoot her. Kennedy got out of the way, and defendant left the apartment through the rear balcony door.

¶ 18    Defendant testified that he was not trying to kill or hurt Mason when he fired the gun repeatedly but, rather, was scared and was just trying to get out of the apartment unharmed.

7

Pulling the trigger was more of a reflexive action. Defendant did not recall how many times he had fired his weapon and said that he fired the weapon because he was afraid for his life. When asked why he was afraid, defendant stated that he had never been to the apartment before, he did not know where he was at, and it was dark. Upon being asked further, defendant stated that he had no doubt in his mind that Mason was going to harm him. According to defendant, his gun had an easy trigger pull and would shoot as fast as the person using the gun could pull the trigger. As defendant was firing the gun, he was afraid and shaken and just wanted to get out of the apartment. He did not realize that he had even hit Mason with any of the shots. During his testimony, defendant stated that he did not recall if Mason was heading toward the rear balcony door, only that Mason was backing up a little into the kitchen. After Mason went down, defendant stopped firing. Defendant started to run out of the apartment but then realized that he did not have his keys or phone or anything. Defendant turned to go back to the bedroom to grab his belongings, and Kennedy stood in the way. Defendant told Kennedy to move and that he needed to get his stuff. Kennedy did so. Defendant grabbed as much of his belongings as he could and then ran out of the apartment to his vehicle. He was still naked and still wearing a condom. Defendant denied during his testimony that he had pointed the gun at or threatened Kennedy and also denied that he had accused Kennedy of setting him up, although defendant acknowledged that Kennedy had sent him a text message after the incident in which she stated that she had not set him up. After defendant left the apartment, he received multiple phone calls and one or more text messages from Kennedy, but he did not answer Kennedy's calls or respond to Kennedy's messages.

¶ 19        After all the evidence had been presented, the trial court took the case under advisement. The trial court later found defendant guilty of ABWF and AUUW but found defendant not guilty

of attempted first degree murder. In announcing its ruling, the trial court stated, in pertinent part, as follows:

"I am—I am gonna take this case in two parts. As to the bedroom, I am finding the Defendant not guilty on attempt first degree murder. It was a very dark apartment, he could not see. From what he could hear and what he could see, he's much smaller than Jermian [*sic*] Mason, he thought his life was in danger and I believe that is reasonable when he was in that bedroom. So I am finding him not guilty on attempt first degree murder. However, on Count 2[,] I am finding you guilty because—this is your own testimony—when you get out of the bedroom the Defendant—Jermian [*sic*] Mason is facing you, you know that's the outer door that he's going to. You also testified that—how you knew that Jermain Mason was bigger than you was because there was a light emanating from under the door.

So as Jermian [*sic*] Mason came closer and closer to that balcony door there was some light. And that's according to Mr. Williams [the defendant] himself. I believe that was unreasonable and without justification. On aggravated battery of a firearm [*sic*] the State has to show that he knowingly and intentionally caused injury to another person and that's by means of discharging a firearm and looking at justification and self-defense. At that point I don't believe it was reasonable. As a matter of fact, at that point Jermian [*sic*] Mason was actually trying to get out of the door and I believe there was some light from the outside. And that's per the Defendant himself.

9

So I am finding the aggravated battery with a firearm was without legal justification. So I'm finding you guilty of Count 2 and Count 3 and not guilty of Count 1."

¶ 20 Following the trial court's decision, defendant filed a posttrial motion for a finding of not guilty or, alternatively, for a new trial. In the motion, defendant argued, among other things, that: (1) he had not been proven guilty of ABWF beyond a reasonable doubt because the State failed to negate defendant's claim of self-defense; and (2) the State's failure to recognize defendant's Indiana gun permit (that defendant had a gun permit from Indiana at the time of the AUUW offense) violated defendant's constitutional rights. After a hearing, the trial court denied defendant's posttrial motion. In so doing, the trial court noted as to defendant's AUUW conviction that although it could consider defendant's Indiana gun permit as mitigation in sentencing, it knew of no case law or statute that would allow defendant to carry a gun into Illinois. A sentencing hearing was subsequently held, and defendant was sentenced to consecutive terms in prison of eight years for ABWF and one year for AUUW. Defendant appealed.

¶ 21                                    II. ANALYSIS

¶ 22                                      A. ABWF

¶ 23 As his first point of contention on appeal, defendant argues that he was not proven guilty beyond a reasonable doubt of ABWF and that his conviction of that charge should be overturned. More specifically, defendant asserts that the evidence presented at trial was insufficient to negate his claim of self-defense. Defendant contends that the trial court erroneously reached the opposite conclusion because the trial court: (1) incorrectly decided to treat the shots fired by defendant as taking place in two parts—the shots fired in the bedroom (which the trial court

10

determined were legally justified by self-defense and found defendant not guilty of attempted murder) and the shots fired in the kitchen (which the trial court determined were not legally justified by self-defense and found defendant guilty of ABWF)—even though all of the shots were fired by defendant in rapid succession without any lapse, delay, or change in circumstances; (2) incorrectly placed a burden on defendant, that the law does not require, to exercise infallible judgment during a brief period of time when defendant was under great stress and excitement; (3) failed to consider how defendant perceived the danger and whether defendant's perception was objectively reasonable; and (4) based its decision, in part, upon its incorrect recollection of defendant's testimony in that the trial court incorrectly thought that defendant indicated he knew the victim was trying to leave the apartment and that there was additional light in the kitchen area. For all of the reasons stated, defendant asks that we reverse his ABWF conviction outright.

¶ 24    The State argues that defendant was proven guilty beyond a reasonable doubt of ABWF and that defendant's conviction should be upheld. According to the State, defendant's assertions to the contrary are without merit because: (1) although defendant relies upon the trial court's alleged determination that the State failed to negate defendant's claim of self-defense as to the attempted murder charge, the trial court made no such determination and may have found defendant not guilty of the attempted murder charge based upon a perceived lack of proof as to the intent element of that offense; (2) defendant improperly attempts to challenge the trial court's finding of guilty on the ABWF charge by claiming that the finding of guilty is inconsistent with the finding of not guilty on the attempted murder charge, a legal argument (inconsistent verdicts) that is no longer allowed under Illinois law; (3) the trial court's determination that defendant did not act in self-defense with regard to the ABWF charge was not improbable or unsatisfactory, as is required for a reversal of defendant's conviction under the *Collins* standard (*People v. Collins*,

11

106 Ill. 2d 237, 261 (1985)), since there was no evidence in this case that Mason (the victim) threatened unlawful force or took aggressive action against defendant and since defendant's beliefs regarding self-defense were not objectively reasonable; and (4) despite defendant's assertion to the contrary, it is clear from the record that the trial court considered defendant's perception of the danger and the factual circumstances of this case and found that defendant's conduct was not objectively reasonable. For all of the reasons set forth, the State asks that we affirm defendant's conviction of ABWF.

¶ 25    In reply to the State's contentions, defendant asserts that: (1) any reasonable reading of the record and the applicable law shows that the trial court found that the State had failed to negate defendant's claim of self-defense as to the attempted murder charge; (2) although the State claims that the evidence does not establish that the shots were fired without any lapse in time, it was uncontested that the shooting happened quickly and none of the three main witnesses who testified about the incident testified that any lapse of time occurred; (3) where defendant was initially justified in firing the gun, it was incumbent upon the State to prove that a sufficient time interval passed between the initial four shots and the subsequent five shots, which would have allowed defendant, acting as a reasonable person, to realize that no further shooting was necessary; (4) defendant is not arguing inconsistent verdicts, as the State suggests but, rather, is arguing that he was not proven guilty beyond a reasonable doubt; (5) the State's claim that there was no evidence that Mason had threatened unlawful force against defendant or was the aggressor ignores the case law on self-defense where Illinois courts have found that it is not necessary that the danger be real or that the victim be armed with a weapon, only that the facts and circumstances of the case induced a reasonable belief in the defendant that the threatened danger existed; (6) the trial court's determination that it was unreasonable for defendant to

12

continue fearing for his life (after the first four shots had been fired in the bedroom) and that defendant should have realized that Mason was no longer an actual threat disregarded the fact that defendant could not escape at that point from the danger Mason posed since Mason was still in front of defendant and blocking defendant's only exit; and (7) this is not a case where the force used by the defendant continued well-beyond the point at which the apparent danger ceased to exist such that defendant's claim of self-defense would no longer be reasonable. For those reasons and for the reasons initially asserted, defendant again asks this court to reverse his conviction of ABWF outright.

¶ 26 Pursuant to the *Collins* standard, a reviewing court faced with a challenge to the sufficiency of the evidence must view the evidence in a light most favorable to the prosecution and determine whether any rational trier of fact could have found the elements of the crime proven beyond a reasonable doubt. See *People v. Jackson*, 232 Ill. 2d 246, 280 (2009). In applying the *Collins* standard, the reviewing court must allow all reasonable inferences from the record in favor of the prosecution. *People v. Bush*, 214 Ill. 2d 318, 326 (2005). The reviewing court will not retry the defendant. *People v. Austin M.*, 2012 IL 111194, ¶ 107. Determinations of witness credibility, the weight to be given testimony, and the reasonable inferences to be drawn from the evidence are responsibilities of the trier of fact, not the reviewing court. *People v. Jimerson*, 127 Ill. 2d 12, 43 (1989). Thus, the *Collins* standard of review fully recognizes that it is the trier of fact's responsibility to fairly resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. See *Jackson*, 232 Ill. 2d at 281. That same standard of review is applied by the reviewing court regardless of whether the evidence is direct or circumstantial, or whether defendant received a bench or a jury trial, and circumstantial evidence meeting that standard is sufficient to sustain a criminal

13

conviction. *Id.*; *People v. Kotlarz*, 193 Ill. 2d 272, 298 (2000). In applying the *Collins* standard, a reviewing court will not reverse a conviction unless the evidence is so improbable, unsatisfactory, or inconclusive that it leaves a reasonable doubt of the defendant's guilt. *Austin M.*, 2012 IL 111194, ¶ 107.

¶ 27        As indicated above, there is no dispute in this case that defendant shot Mason (the victim) multiple times and that Mason was injured. The only dispute as to the ABWF conviction is whether the State sufficiently negated defendant's claim of self-defense. Section 7-1 of the Criminal Code of 2012 provides, in pertinent part, that "[a] person is justified in the use of force against another when and to the extent that he reasonably believes that such conduct is necessary to defend himself or another against such other's imminent use of unlawful force." 720 ILCS 5/7-1(a) (West 2016). Self-defense is an affirmative defense—once it has been raised by the defendant, the State bears the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense, in addition to proving the elements of the offense charged. 720 ILCS 5/7-14 (West 2016); *People v. Lee*, 213 Ill. 2d 218, 224 (2004). To establish a claim of self-defense, the defendant must present some evidence as to each of the following six elements: (1) that unlawful force was threatened against him; (2) that he was not the aggressor; (3) that the danger of harm to him was imminent; (4) that the use of force was necessary; (5) that he actually and subjectively believed a danger existed that required the use of the amount of force applied; and (6) that his beliefs in that regard were objectively reasonable. See 720 ILCS 5/7-1 (West 2016); *Lee*, 213 Ill. 2d at 225; *People v. Montes*, 263 Ill. App. 3d 680, 690 (1994). If the State negates any one of those elements, the defendant's claim of self-defense must be rejected. *Lee*, 213 Ill. 2d at 225.

14

¶ 28    The use of deadly force in self-defense is only justified when a person reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or to another or to prevent the commission of a forcible felony. 720 ILCS 5/7-1(a) (West 2016). The determination of that issue is dependent upon the circumstance involved (see *People v. Woods*, 81 Ill. 2d 537, 542 (1980)) and the key question is whether the defendant's belief that it was necessary to use deadly force was reasonable under those circumstances (see *Montes*, 263 Ill. App. 3d at 690). A person who is thrust into a life-endangering situation is not required to use infallible judgment in deciding whether and how to act to defend himself. See *People v. White*, 87 Ill. App. 3d 321, 323 (1980). Such a requirement would be unreasonable to impose upon a decision that must be made very quickly by a person who is fearful and under great stress. *Id*.

¶ 29    In the present case, after having reviewed the record, we find that the evidence was insufficient to negate defendant's claim of self-defense as necessary to prove defendant guilty of ABWF. Viewed in the light most favorable to the State, the evidence presented at defendant's bench trial showed that defendant fired nine shots in rapid succession at Mason as defendant tried to make his way to the rear balcony door and escape from the apartment. Defendant was naked at the time in a dark, narrow, and unfamiliar apartment and facing the real and imminent threat of an angry boyfriend, who was much larger in size than defendant, was carrying a dark object in his hand that defendant thought was a weapon, was closing in on defendant's position, and who had just caught defendant having sex with his girlfriend. Although the trial court drew a distinction between the shots fired in the bedroom and those fired in the kitchen, that distinction was unwarranted in this case as the evidence showed that all of the shots were fired in rapid succession over a very short period of time and no evidence was presented to suggest that

15

there was any lapse, delay, or significant change in circumstances between the shots fired in the bedroom and the shots fired in the kitchen. See *People v. Bailey*, 27 Ill. App. 3d 128, 133-36 (1975) (reversing a defendant's aggravated battery convictions where the State failed to negate the defendant's claim of self-defense and indicating in a situation where all of the shots were fired in rapid succession, that when a defendant was initially justified by self-defense in firing a gun, it was incumbent upon the State to prove that a sufficient time interval passed between the initial shots and subsequent shots that would have allowed the defendant, acting as a reasonable person, to realize that no further shooting was necessary); *Brown v. United States*, 256 U.S. 335, 344 (1921) (reversing a defendant's conviction for murder in the second degree and indicating that a person who shot another in self-defense did not necessarily lose his or her right to do so merely because the final shot was intentional and may have seemed unnecessary when considered in cold blood, such as if the assailant was down at the time of the final shot, if the final shot followed close upon the other shots while the heat of the conflict was on and the defendant believed that he was fighting for his life); *People v. Motuzas*, 352 Ill. 340, 347 (1933) (reversing a defendant's conviction for murder and finding that the defendant had justifiably acted in self-defense and noting that for a valid self-defense claim, it was not necessary that the danger to the defendant was actually real, rather than just apparent, or that the victim was actually armed with a weapon, only that the defendant was confronted with such means or force as to cause the defendant to have a reasonable belief that he was in danger of losing his life or suffering great bodily harm); *White*, 87 Ill. App. 3d at 323 (reversing a defendant's conviction for voluntary manslaughter where the State had failed to negate the defendant's claim of self-defense and recognizing that the law did not require a person, who had reasonable grounds to believe he was in apparent danger of losing his life or suffering great bodily harm, to use

16

infallible judgment). Under the circumstances of this case, we must conclude, therefore, that the State failed to negate defendant's claim of self-defense as to the ABWF charge. See 720 ILCS 5/7-1(a) (West 2016); *Lee*, 213 Ill. 2d at 225-26; *Montes*, 263 Ill. App. 3d at 690; *Bailey*, 27 Ill. App. 3d at 133-36. We, therefore, reverse defendant's conviction of ABWF.

¶ 30                                                    B. AUUW

¶ 31         As his second point of contention on appeal, defendant argues, and the State concedes, that the trial court erred in finding defendant guilty of AUUW where the charge was based, in part, upon defendant's failure to have an Illinois FOID card at the time of the offense. The parties agree that such a conviction cannot stand under the circumstances of the present case where at the time of the offense, defendant was an Indiana resident and held a valid Indiana gun permit and was not required, therefore, to have an Illinois FOID card. See *People v. Holmes*, 241 Ill. 2d 509, 522 (2011) (finding that the defendant in that case could not be convicted of the same AUUW offense as charged in the instant case where the defendant had a valid gun permit from Indiana, his state of residence, when the offense occurred). Accordingly, we reverse defendant's AUUW conviction.

¶ 32                                              III. CONCLUSION

¶ 33         For the foregoing reasons, we reverse defendant's convictions of ABWF and AUUW.

¶ 34         Reversed.

¶ 35         JUSTICE WRIGHT, specially concurring:

¶ 36         I agree with the majority's decision to reverse defendant's convictions as unsupported by the evidence. However, I elect to write separately in order to draw attention to the systemic delay present in this record.

¶ 37    Initially, this court directed defendant's court-appointed appellate counsel to submit defendant's initial brief to this court on or before August 23, 2018. However, on eight occasions that initial deadline was extended at defense counsel's request due to growing backlog in OSAD. This court received defendant's opening brief on November 6, 2019, more than a year later than the original deadline.

¶ 38    Here, defendant's conviction has been set aside but defendant remained imprisoned, at considerable cost to the taxpayers, for at least 448 days *before* OSAD filed their brief in this appeal. Surely it is not unreasonable to significantly raise expectations for more timely work production by OSAD. More and more often, reviewing courts have noted OSAD's delay with disapproval. See *People v. Butts*, 2018 IL App (1st) 150338-U, *People v. Cisco*, 2019 IL App (4th) 160515, and *People v. Prokesh*, 2020 IL App (3d) 170763-U.

¶ 39    Once again, I rhetorically wonder whether this is an appeal where justice could have been less delayed despite the most favorable outcome available in a criminal appeal.